# COMPOSITE EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60359-CR-ALTMAN/HUNT
18 U.S.C. § 371

UNITED STATES OF AMERICA

v.

HSBC PRIVATE BANK (SUISSE) SA,

Defendant.
_____/

## DEFERRED PROSECUTION AGREEMENT

The Tax Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Florida (collectively, the "Office") and defendant HSBC Private Bank (Suisse) SA ("HSBC Switzerland" or the "Bank"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

This Agreement shall take effect upon its execution by both parties.

### THE CRIMINAL INFORMATION

1.      HSBC Switzerland waives indictment and consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of Florida (the "Court"), charging HSBC Switzerland with conspiring with others, including U.S. persons, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"), (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201. A copy of the Information is attached hereto as Exhibit B.

### ACCEPTANCE OF RESPONSIBILITY

2.      HSBC Switzerland admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate. HSBC Switzerland further admits and stipulates that the acts labeled "overt acts" in Paragraph 13 of the Information in fact took place. In sum, HSBC Switzerland admits that it is responsible under United States law for the acts of its officers, employees, and agents and that the allegations of

federal criminal violations charged in the Information and set forth in the Statement of Facts as a result of those acts are true and accurate.

## RESTITUTION, FORFEITURE, AND PENALTY OBLIGATIONS

3.      As a result of the conduct described in the Information and the Statement of Facts, HSBC Switzerland agrees to make payments in total of $192,350,000 to the United States. Specifically, HSBC Switzerland agrees to (1) make a payment of restitution in the amount of $60,600,000 (the "Tax Restitution Amount"), (2) forfeit $71,850,000 (the "Forfeiture Amount") to the United States, and (3) pay a penalty of $59,900,000 (the "Penalty Amount") to the U.S. Department of Justice (the "Department"), as set forth below.

### Restitution

4.      In regard to the Tax Restitution Amount, HSBC Switzerland admits that the Tax Restitution Amount represents the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts. The Tax Restitution Amount shall not be further reduced by payments that have been made or may be made to the United States by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement. HSBC Switzerland agrees to pay the Tax Restitution Amount to the IRS by wire transfer within fourteen (14) days of the date of the execution of this Agreement. If HSBC Switzerland fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 20 and 21, below.

### Forfeiture

5.      The Forfeiture Amount of $71,850,000 represents approximate gross fees paid to HSBC Switzerland by U.S. taxpayers with undeclared accounts at HSBC Switzerland from 2002 through December 31, 2009. HSBC Switzerland agrees, pursuant to Title 18, United States Code, Section 981(a)(1)(C) that it will forfeit to the United States the Forfeiture Amount.

6.      The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within fourteen (14) days of the execution of this Agreement. If HSBC Switzerland fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 20 and 21, below.

7.      Upon payment of the Forfeiture Amount, HSBC Switzerland shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. HSBC Switzerland agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount or the payment of the Penalty Amount and will not assist a third party in asserting any claim to the Forfeiture Amount or the Penalty Amount.

8.     HSBC Switzerland agrees this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, HSBC Switzerland expressly waives service of that Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Forfeiture Amount. HSBC Switzerland also agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

## **Penalty**

9.     The Office and HSBC Switzerland agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), and in light of the Forfeiture Amount and the Tax Restitution Amount, the Penalty Amount of $59,900,000 is an appropriate penalty. HSBC Switzerland agrees to pay the Penalty Amount as directed by the Office within fourteen (14) business days of the date of the execution of this Agreement. The Penalty Amount represents a reduction of approximately 50% from the low end of the fine range that the parties agree would be applicable under the United States Sentencing Guidelines if HSBC Switzerland had been convicted and sentenced for its criminal conduct. The Office and HSBC Switzerland agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of HSBC Switzerland's conduct as set forth in the Statement of Facts, and also, in mitigation of a higher penalty, among other things, HSBC Switzerland's self-reporting its conduct to the Office, performing a thorough internal investigation, providing client identifying information to the Office and extensively cooperating in a series of investigations and prosecutions, as well as the facts set forth in Paragraphs 38 through 45 of the Statement of Facts. The Office and HSBC Switzerland further agree that the Penalty Amount is final and shall not be refunded, that nothing in this Agreement shall be deemed an agreement by the Office that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and that the Office is not precluded from arguing in any future prosecution that the Court should impose a higher penalty. Under those circumstances, the Office agrees that it will recommend to the Court that HSBC Switzerland's payment of the Penalty Amount, pursuant to the Agreement, should be credited toward any fine ordered by the Court as part of a future judgment.

## **Non-Deductibility**

10.    HSBC Switzerland agrees that the Tax Restitution Amount, the Forfeiture Amount and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States government for all tax purposes under United States law. HSBC Switzerland agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $192,350,000 that HSBC Switzerland has paid to the United States pursuant to this Agreement.

## **TERM OF THE AGREEMENT**

11.    HSBC Switzerland agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date

thereof, unless otherwise extended pursuant to Paragraph 12 below (the "Deferral Period"). HSBC Switzerland's obligation to cooperate is not intended to apply in the event that a prosecution against HSBC Switzerland by this Office is pursued and not deferred.

12.     HSBC Switzerland agrees that, in the event that the Office determines during the Deferral Period described in Paragraph 11 above (or any extensions thereof) that HSBC Switzerland has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Office, up to an additional 1 year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four years.

## DEFERRAL OF PROSECUTION

13.     HSBC Switzerland has made a commitment to: (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Office and the IRS (as provided herein in Paragraphs 15 through 17); (c) make the payments specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 15(f)); and (e) otherwise comply with all of the terms of this Agreement. In consideration of the foregoing, the Office shall recommend to the Court that prosecution of HSBC Switzerland on the Information be deferred for three years. HSBC Switzerland shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of Florida for the period during which this Agreement is in effect.

14.     The Office agrees that if HSBC Switzerland is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against HSBC Switzerland pursuant to this Agreement. Except in the event of a violation by HSBC Switzerland of any term of this Agreement or as otherwise provided in Paragraph 20, the Office will bring no additional charges or other civil action against HSBC Switzerland relating to its conduct as described in the Information or Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual nor entity other than HSBC Switzerland, its predecessors such as HSBC Guyerzeller AG, and its subsidiaries, or its affiliated entities that provide banking services in Switzerland. HSBC Switzerland and the Office understand that the Court must approve deferral under the Speedy Trial Act, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to defer prosecution for any reason: (a) both the Office and HSBC Switzerland are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 20, below; and (c) if they have already been transferred to the United States, the Tax Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to HSBC Switzerland.

## COOPERATION

15.     During the Deferral Period, HSBC Switzerland shall cooperate fully, subject to applicable laws and regulations, with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding all matters related to the Office's investigation into U.S.-related accounts banking in Switzerland at HSBC Switzerland (the "Office's Investigation") about which HSBC Switzerland has information or knowledge, including:

> (a) truthfully and completely disclose all information with respect to the activities of HSBC Switzerland, its officers and employees, and others concerning all such matters about which this Office inquires related to this Office's Investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law;

> (b) specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Swiss Bank Program") as set forth specifically in Parts II.D.1(a)-(d) and 2 of the Program;

> (c) expand, as soon as practicable, transaction information previously produced in response to requests based on Part II.D.2.b.vi of the Swiss Bank Program, by six months to include accounts closed in the period from January 1, 2009 through December 31, 2017;

> (d) make reasonable efforts to bring accounts of recalcitrant account holders, as defined in Title 26, United States Code, Section 1471(d)(6), into tax compliance, and, if such reasonable efforts are unsuccessful, then to implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Swiss Bank Program;

> (e) truthfully and completely disclose, and continue to disclose during the Deferral Period, consistent with applicable law and regulations, all information described in Part II.D.1(a)-(d) of the Swiss Bank Program with respect to U.S.-related accounts held by HSBC Switzerland and any statistical data that would have been relevant to the calculation of Forfeiture and Tax Restitution Amounts from 2002 through 2009 that is not protected by a valid claim of privilege or work product with respect to the activities of HSBC Switzerland and its officers, directors, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement.  Subject to applicable laws and regulations, HSBC Switzerland shall disclose to the Tax Division that it has discovered new information required to be disclosed under this Agreement, including pursuant to this paragraph and paragraph 15(b) and (c), no later than thirty days from discovery and provide such information, including information as described in Part II.D.1(a)-(d) of the Program and information pursuant to paragraph 15(b) and (c) of this Agreement, no later than ninety days from discovery.  All other terms of this Agreement shall apply with respect to any newly disclosed information; and

(f) HSBC Switzerland shall commit no violations of the federal criminal laws of the United States.

16.     It is further understood that during the Deferral Period, HSBC Switzerland will bring, consistent with applicable laws or regulations, to this Office's attention: (a) all criminal conduct by, and criminal investigations of, HSBC Switzerland or its employees related to any violations of the federal laws of the United States that come to the attention of HSBC Switzerland's board of directors, executive committee, or senior management, and (b) any investigation conducted by, or any civil, administrative, or regulatory proceeding brought by, any U.S. governmental authority that alleges fraud by HSBC Switzerland or any other violations of the federal laws of the United States in the operation or management of HSBC Switzerland's business.

17.     Notwithstanding the Deferral Period, HSBC Switzerland shall also, subject to applicable laws or regulations, continue to cooperate with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding any and all matters related to the Office's Investigation until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether those examinations, investigations, or proceedings are concluded within the Deferral Period, including:

> (a) cooperate fully with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding all matters related to the Office's Investigation;

> (b) retain all records relating to the Office's Investigation, for a period of 10 years from the end of the Deferral Period;

> (c) provide all necessary information and assist the United States with the drafting of treaty requests seeking account information for accounts owned and/or controlled by U.S. persons, and collect and maintain all records that are potentially responsive to such treaty requests in order to facilitate a prompt response;

> (d) assist the Office or any designated federal law enforcement agency in any investigation, prosecution, or civil proceeding arising out of or related to the Office's Investigation by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding;

> (e) use its best efforts promptly to secure the attendance and truthful statements or testimony or information of any current or former officer, director, employee, agent, or consultant of HSBC Switzerland at any meeting or interview or before any grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Office's Investigation;

> (f) provide testimony of a competent witness as needed to enable the Office and any designated federal law enforcement agency to use the information and evidence obtained pursuant to HSBC Switzerland's cooperation with the Office before a grand

6

jury or at any trial or other court proceeding regarding matters arising out of or related to the Office's Investigation;

(g) provide the Office, upon request, consistent with applicable law and regulations, all information, documents, records, or other tangible evidence not protected by a valid claim of privilege or work product regarding matters arising out of or related to the Office's Investigation about which the Office or any designated federal law enforcement agency inquires, including the translation of significant documents at the expense of HSBC Switzerland; and

(h) provide to any state law enforcement agency such assistance as may reasonably be requested in order to establish the basis for admission into evidence of documents already in the possession of such state law enforcement agency in connection with any state civil or criminal tax proceedings brought by such state law enforcement agency against an individual arising out of or related to the Office's Investigation.

18.     HSBC Switzerland agrees to use best efforts to close, as soon as practicable, and in no event later than the end of the Deferral Period, any and all accounts owned and/or controlled by U.S. persons that have been classified as "dormant" in accordance with applicable Swiss laws, regulations and guidelines, and will provide periodic reporting upon request of the Office if unable to close any dormant accounts within that time period. HSBC Switzerland will only provide banking or securities services in connection with any such "dormant" account to the extent that such services are required pursuant to applicable Swiss laws, regulations and guidelines. If at any point contact with the account holder(s) (or other persons(s) with authority over the account) is re-established, HSBC Switzerland will promptly proceed to follow the procedures described above in Paragraph 15(d).

19.     Nothing in this Agreement shall require HSBC Switzerland to waive any protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless HSBC Switzerland voluntarily chooses to waive any such privilege. Nothing in this Agreement shall require HSBC Switzerland to violate the law of any jurisdiction in which it operates.

## BREACH OF THE AGREEMENT

20.     It is understood that should the Office in its sole discretion determine during the Deferral Period that HSBC Switzerland:  (a) has knowingly given materially false, incomplete or misleading information either during the Deferral Period or in connection with the Office's Investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise knowingly violated any provision of this Agreement, HSBC Switzerland shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.  Any such prosecution or civil action may be premised on any information provided by or on behalf of HSBC Switzerland to the Department or the IRS at any time.  In any prosecution or civil action based on the Information,

the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and HSBC Switzerland), and excluding the period from the execution of this Agreement until its termination; and (b) HSBC Switzerland agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 12 above. By this Agreement, HSBC Switzerland expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of HSBC Switzerland's counsel.

21.     It is further agreed that in the event that the Office, in its sole discretion, determines that HSBC Switzerland has knowingly violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of HSBC Switzerland to the Office, the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by HSBC Switzerland or by any agent of HSBC Switzerland before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against HSBC Switzerland; and (b) HSBC Switzerland shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of HSBC Switzerland before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

22.     HSBC Switzerland, having admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any public statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Any such contradictory statement by HSBC Switzerland, through its present or future attorneys, agents, or employees, shall constitute a violation of this Agreement, and HSBC Switzerland thereafter shall be subject to prosecution as specified in Paragraphs 20 and 21, above, or the Deferral Period shall be extended pursuant to Paragraph 12, above. The decision as to whether any such contradictory statement will be imputed to HSBC Switzerland for the purpose of determining whether HSBC Switzerland has violated this Agreement shall be within the sole discretion of the Office. Upon the Office's notifying HSBC Switzerland of any such contradictory statement, HSBC Switzerland may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office. HSBC Switzerland consents to the public release by the Office, in its sole discretion, of any such repudiation. The Office agrees that nothing in this Agreement in any way prevents HSBC Switzerland from taking good faith positions, raising defenses, or asserting affirmative claims that are not inconsistent with the Statement of Facts in any civil proceedings, investigations, or litigation involving private parties or government entities, including non-U.S. litigations or non-U.S. investigations. Nothing in this Agreement is meant to affect the obligation of HSBC

8

Switzerland or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

23.     HSBC Switzerland agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in Paragraphs 20 and 21 above, or instead to choose to extend the period of deferral of prosecution pursuant to Paragraph 12.  HSBC Switzerland understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court.  Should the Office determine that HSBC Switzerland has violated this Agreement, the Office shall provide prompt written notice to HSBC Switzerland of that determination and provide HSBC Switzerland with a 30-day period from the date of receipt of notice in which to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by HSBC Switzerland.

## ADDITIONAL PROVISIONS

### Limits of the Agreement

24.     It is understood that this Agreement is binding on the Office but does not bind any other components of the Department, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by HSBC Switzerland or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of HSBC Switzerland, and HSBC Switzerland's compliance with its obligations under this Agreement.

### Public Filing

25.     The Office and HSBC Switzerland agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of Florida.

26.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

27.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

### Integration Clause

28.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between HSBC Switzerland and the Office.  This Agreement supersedes all prior understandings or promises between the Office and HSBC Switzerland.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, HSBC Switzerland's attorneys, and a duly authorized representative of HSBC Switzerland.

Agreed and accepted to:

For the United States of America:

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General for Criminal Matters
Tax Division


By:_____                    _12_/_10_/_19_
Mark F. Daly                                                Date
Senior Litigation Counsel
Jason H. Poole
Assistant Chief
Grace Albinson
Trial Attorney


For HSBC Switzerland:

_____                        _12_(_10_)9___
ALEXANDER CLASSEN                               Date
Chief Executive Officer, HSBC Switzerland


_____                        _12_/_10_/_19___
RACHEL MATTATIA                                 Date
General Counsel, HSBC Switzerland


_____                        _12_/_10_/_19___
MATTHEW B. HOLMWOOD                              Date
WilmerHale LLP
Attorney for HSBC Switzerland


10

# EXHIBIT A
# TO THE
# DEFERRED
# PROSECUTION
# AGREEMENT

## LEGALIZATION

I, the undersigned notary public of Geneva (Switzerland) Me Caroline Michel, hereby certify that the foregoing signatures have been executed today before me by

**Dr. Andreas von Planta**, born on ██████████ 1955 (nineteen hundred and fifty five), Swiss citizen of Basel, resident of Geneva (Switzerland), who furnished proof of identity through his Swiss passport n° ███ 5403,

and

**Hervé Cherix**, born on ██████████ 1969 (nineteen hundred and sixty nine), Swiss citizen of Chêne-Bourg, resident of Chêne-Bourg (Switzerland), who furnished proof of identity through his Swiss passport n° ███ 7619,

who are entered in the Register of Commerce of the Canton of Geneva (Switzerland) with joint agent signature at two for the

HSBC Private Bank (Suisse) SA, limited company with domicile in Geneva (Switzerland),

Dr. Andreas von Planta as Chairman of the Board and Hervé Cherix, Company Secretary acting **as** Secretary of the Board.

Geneva (Switzerland) this 18th (eighteenth) day of November 2019 (two thousand and nineteen)



**CERTIFICATE OF CORPORATE RESOLUTION OF THE BOARD OF DIRECTORS
OF HSBC PRIVATE BANK (SUISSE) SA**

We, Andreas von Planta, Chairman of the Board of Directors (the Board) of HSBC Private Bank
(Suisse) SA (PBRS), a limited company duly organized and existing under the laws of Switzerland,
and Hervé Cherix, Company Secretary of PBRS acting as Company Secretary of the Board, do
hereby certify that the following is a complete and accurate copy of a resolution adopted by the
Board of Directors of PBRS on 18 November 2019:

1.  That the board of directors of PBRS:

    a)  has thoroughly reviewed and understands the Deferred Prosecution Agreement
        attached hereto, including the Criminal Information, Statement of Facts and Civil
        Forfeiture Complaint, attached respectively as Exhibits B, C, and D to the Deferred
        Prosecution Agreement;

    b)  has consulted with U.S. and Swiss legal counsel in connection with this matter,
        including with respect to PBRS's rights, possible defenses, the relevant United
        States Sentencing Guidelines provisions, and the consequences of entering into the
        Deferred Prosecution Agreement;

    c)  is fully satisfied with its attorneys' representation during all phases of the
        investigation and the resolution of this matter;

    d)  acknowledges the unanimous approval of the Deferred Prosecution Agreement by
        PBRS's Board and its request that the Board of Directors vote to enter into the
        Deferred Prosecution Agreement;

    e)  has unanimously voted to enter into the Deferred Prosecution Agreement,
        including:

        i)  consenting to the filing of a one-count criminal information in the United
            States District Court for the Southern District of Florida, charging PBRS
            with conspiring with others, including U.S. taxpayers, in violation of Title
            18, United States Code, Section 371, to (1) defraud the United States and
            an agency thereof, to wit, the United States Internal Revenue Service, (2) to
            file false federal income tax returns in violation of Title 26, United States
            Code, Section 7206(1), and (3) to evade federal income taxes in violation

of Title 26, United States Code, Section 7201; ii) waiving indictment on this charge; and iii) to make payments totaling USD 192,350,000 as follows:

(1)    to make a payment of restitution in the amount of USD 60,600,000 to the United States Internal Revenue Service, representing the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts;

(2)    to forfeit an amount of USD 71,850,000 to the United States Department of the Treasury for approximate fees earned by PBRS as a result of the conduct described in the Statement of Facts; and

(3)    to pay a penalty in the amount of USD 59,900,000 as directed by the United States Attorney for the Southern District of Florida or the Tax Division of the United States Department of Justice.

2.    That Alexander Classen, Chief Executive Officer of PBRS, and Rachel Mattatia, General Counsel of PBRS, are hereby authorized each individually (i) to execute the Deferred Prosecution Agreement on behalf of PBRS substantially in such form as reviewed by the Board of Directors with such non-material changes they may approve; and (ii) to take, on behalf of PBRS, all actions and to approve and execute all forms, terms or provisions of any agreement and other documents as may be necessary or appropriate in order to carry out the foregoing; and

3.    That Matthew Holmwood, WilmerHale LLP, is hereby authorized to sign the Deferred Prosecution Agreement in his capacity as PBRS's U.S. counsel.

We further certify that the above resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, we have executed this Certification this 18 November 2019.

Dr. Andreas von Planta
Chairman

Hervé Cherix
Company Secretary

# EXHIBIT B
# TO THE
# DEFERRED
# PROSECUTION
# AGREEMENT

FILED by ___ DD ___ D.C.

Dec 2, 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

19-60359-CR-ALTMAN/HUNT

CASE NO._____

### 18 U.S.C. § 371

### UNITED STATES OF AMERICA

v.

### HSBC PRIVATE BANK (SUISSE) SA,

**Defendant.**

_____/

## INFORMATION

The United States Attorney charges that:

### Introduction

At times relevant to this Information:

1.     Defendant **HSBC PRIVATE BANK (SUISSE) SA ("HSBC Switzerland" or the "Bank")** was a private bank incorporated in Switzerland. HSBC Switzerland was the product of a series of mergers and acquisitions, including HSBC Guyerzeller Bank Ltd., which merged with the Bank in 2009. HSBC Switzerland had its headquarters in Geneva, Switzerland, and maintained offices in Lugano and Zurich.

2.     HSBC Switzerland provided a variety of banking and other financial services to customers both resident inside and outside of Switzerland, including providing private-banking and asset-management services to United States citizens, resident aliens, and legal permanent residents ("U.S. persons"), some of whom lived in the Southern District of Florida. HSBC Switzerland provided these services through relationship managers and other client advisors ("Bankers"), and also acted as a custodian of assets that were managed by both wholly owned and third-party fiduciary service providers.

3.   HSBC Switzerland maintained some bank accounts on behalf of U.S. persons in the names of nominee entities and trusts. HSBC Guyerzeller Trust Company AG and HSBC Trust Company AG were wholly owned subsidiaries of HSBC Switzerland and were fiduciary-service providers that created and managed some of the nominee entities and trusts on behalf of HSBC clients.

4.   U.S. persons were obligated to report all income earned worldwide, including from foreign bank accounts, on their tax returns and to pay the taxes due on that income. U.S. persons were also obligated to report to the Internal Revenue Service ("IRS"), on Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

5.   In addition, U.S. persons who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file a Report of Foreign Bank and Financial Accounts, Form TD 90-22.1 (since changed to FinCEN Form 114), ("FBAR"), with the Department of the Treasury.

6.   An "undeclared account" was a financial account beneficially owned by a U.S. person and maintained in a foreign country that the U.S. person had not timely reported to the United States on a tax return and FBAR.

## COUNT 1
## CONSPIRACY
## 18 U.S.C. § 371

7.   The factual allegations contained in Paragraphs 1 through 6 of this Information are realleged and incorporated by reference as if copied verbatim.

2

8.      From at least 2000 through 2010, in the Southern District of Florida and elsewhere, the defendant,

## HSBC PRIVATE BANK (SUISSE) SA,

unlawfully, voluntarily, intentionally, and knowingly conspired and agreed with U.S. persons, HSBC Switzerland Bankers and employees, and wholly owned and third-party fiduciaries and fiduciary service providers, (1) to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, namely, federal income taxes and (2) to commit offenses against the United States, namely, violations of Title 26, United States Code, Sections 7201 and 7206(1).

9.      It was an object of the conspiracy that HSBC Switzerland and its co-conspirators would conceal the offshore assets and income of U.S. persons who maintained financial accounts at HSBC Switzerland from the IRS, evade those U.S. persons' U.S. tax obligations, and file false federal tax returns with the IRS.

### Overview of the Conspiracy

10.     From at least 2000 through 2010, HSBC Switzerland assisted U.S. persons in concealing their offshore assets and income from U.S. tax authorities, evading their U.S. tax obligations, and filing false federal tax returns with the IRS. By 2002, the Bank held a total of approximately 720 undeclared relationships on behalf of U.S. persons with an aggregate value of approximately $825 million. The Bank's undeclared assets under management peaked in 2007, at approximately $1.26 billion. HSBC Switzerland and its co-conspirators used Swiss bank secrecy to conceal the accounts of U.S. clients from the U.S. tax authorities, and HSBC

3

Switzerland Bankers would emphasize this to clients and prospective clients. HSBC Switzerland also provided a number of traditional Swiss banking services that further assisted its U.S. clients in concealing their accounts from the U.S. government, including the use of numerical and coded names for accounts, prepaid debit, credit, and travel cards, and hold-mail services in which the Bank would not send any account documents to the account holders.

  11. HSBC Switzerland Bankers advised and assisted U.S. persons to open and maintain bank accounts in the names of nominee entities and trusts that did not serve any business purpose, in order to conceal the U.S. person's beneficial ownership of the accounts.

**Manner and Means of the Conspiracy**

  12. Among the manner and means by which HSBC Switzerland and its co-conspirators carried out the conspiracy were the following:

    a. HSBC Switzerland opened accounts in Switzerland for U.S. persons that the clients did not report to the United States on either Forms 1040, Schedule B, or on FBARs, and for which the U.S. persons did not report or pay taxes on account earnings to the United States. The materially false Forms 1040 that clients filed were often electronically transmitted to the IRS through the use of interstate wire communications. Funds were often transferred to or from these accounts by means of wire transfers in foreign commerce.

    b. HSBC Switzerland managed undeclared accounts for U.S. persons at the Bank.

    c. HSBC Switzerland assured U.S. clients that Swiss bank secrecy would conceal their assets and income from being disclosed to U.S. tax authorities.

    d. HSBC Switzerland provided U.S. clients with code-name or numbered accounts that provided an extra level of concealment.

4

e.  HSBC Switzerland provided U.S. clients with prepaid debit, credit, and travel cards linked to their undeclared accounts, which allowed U.S. clients to withdraw funds remotely or pay for goods and services without a clear paper trail back to their undeclared accounts in Switzerland.

f.  HSBC Switzerland provided hold-mail services, under which account statements and other documents associated with the client's account would not be sent to the client's address in the United States.

g.  HSBC Switzerland created and managed nominee trusts and entities for clients via wholly owned fiduciary-service-provider companies such as HSBC Guyerzeller Trust Company AG and HSBC Trust Company AG and Cordico Management AG.  HSBC Switzerland used these wholly owned fiduciary-service-provider companies to provide individuals from tax-haven countries to serve as trustees or directors of the nominee entities

h.  HSBC Switzerland assisted clients in creating entities that were incorporated in offshore tax-haven jurisdictions, such as the British Virgin Islands, Liechtenstein, and Panama, for further concealment and to circumvent an agreement the Bank had with the IRS that required the Bank to report U.S. persons' ownership of accounts holding U.S. securities.

i.  Beginning in 2007, in order to appear to distance itself from the tax evasion scheme, HSBC Switzerland ceased using its wholly owned subsidiaries to create and manage nominee trusts, and transferred management of these trusts to an individual fiduciary who was a former employee of the Bank.

j.  Beginning in 2009, HSBC Switzerland closed accounts for U.S. persons who had $1 million or less in assets under management, or did not sign an IRS Form W-9

5

and other documents required by the policy. However, some Bankers assisted some clients in closing their accounts in a manner that continued to conceal their offshore assets, including directing their clients to other Swiss banks that were continuing to accept undeclared accounts and allowing clients to withdraw the contents of their accounts in cash.

## Overt Acts

13.     In furtherance of the conspiracy and to effect the illegal objects thereof, HSBC Switzerland and other co-conspirators committed the following overt acts, among others, in the Southern District of Florida and elsewhere:

a.  On various dates between 2000 and 2010, HSBC Switzerland Bankers opened new undeclared accounts for U.S. persons in the names of nominee entities and trusts, including, for example, an HSBC Banker who convinced a client who had accounts with at least three other Swiss banks to transfer some of his assets to HSBC Switzerland and to set up his account in the name of a company established in Panama.

b.  On various dates between in or about 2005 and in or about 2007, at least four HSBC Switzerland Bankers traveled to the United States in order to meet with at least 25 different undeclared U.S. clients, and made efforts to obtain new U.S. clients.

c.  In or around 2006, an HSBC Switzerland Banker travelled to the United States and attended Design Miami, a major annual arts and design event in the Southern District of Florida, in an effort to recruit prospective U.S. clients to open undeclared accounts at HSBC Switzerland.

6

d. In or around 2009, an HSBC Switzerland Banker allowed a U.S. client with an undeclared account holding approximately \$20 million in assets under management to transfer his funds to an account in the name of his girlfriend, who was a citizen of Hong Kong. However, the U.S. client maintained control over the account, and the HSBC Switzerland Banker assured the U.S. client that the account would not be disclosed to U.S. authorities.

All in violation of Title 18, United States Code, Section 371.


ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY


STUART M. GOLDBERG
ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL
TAX DIVISION


MARK F. DALY
SENIOR LITIGATION COUNSEL
JASON H. POOLE
ASSISTANT CHIEF
GRACE E. ALBINSON
TRIAL ATTORNEY

7

# EXHIBIT C
# TO THE
# DEFERRED
# PROSECUTION
# AGREEMENT

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-60359-CR-ALTMAN/HUNT
### 18 U.S.C. § 371

**UNITED STATES OF AMERICA**

v.

**HSBC PRIVATE BANK (SUISSE) SA,**

       **Defendant.**

_____/

## STATEMENT OF FACTS

### I.    BACKGROUND

1.    HSBC Private Bank (Suisse) SA ("HSBC Switzerland") is incorporated and domiciled in Switzerland, with its headquarters in Geneva. HSBC Switzerland is an operating bank subsidiary of HSBC Private Bank Holdings (Suisse) SA, a Swiss-based holding company.[1] At all relevant times, HSBC Switzerland had its own Board of Directors, Chief Executive Officer, Management Executive Committee, and Legal and Compliance functions.

2.    HSBC Switzerland was incorporated in 2001. It is the product of a series of acquisitions and mergers. In 1999, HSBC acquired Republic National Bank of New York ("Republic Bank") and Safra Republic Holdings SA. In 2009, HSBC Switzerland merged with HSBC Guyerzeller Bank Ltd. ("HSBC Guyerzeller").

3.    HSBC Guyerzeller was a Swiss private bank that was wholly owned by HSBC Private Bank Holdings (Suisse) SA. HSBC acquired a majority share of HSBC Guyerzeller in 1992 as part of its acquisition of Midland Bank, a U.K.-based bank that owned HSBC Guyerzeller. In 2002, HSBC integrated HSBC Guyerzeller with Credit Commercial de France (Suisse) SA and Handelsfinanz-CCF Bank, the private Swiss bank businesses of Crédit Commercial de France, which HSBC had acquired in 2000. HSBC Guyerzeller maintained a head office in Zurich, and branches in Geneva and Lugano, as well as representative offices in Hong Kong and Istanbul. Prior to the 2009 merger, HSBC Guyerzeller operated separately from HSBC Switzerland.

4.    Throughout this statement of facts, HSBC Switzerland is used to refer to the current HSBC Switzerland and any of its predecessor entities. When relevant, the names of specific predecessor banks are used.

5.    HSBC Switzerland provided private banking and asset management services to individuals and entities resident both inside and outside of Switzerland, including U.S. persons. HSBC Switzerland provided these services through relationship managers ("Bankers") and other

---

[1]    HSBC Switzerland is indirectly owned by HSBC Holdings plc, a U.K.-based holding company ("HSBC").

client advisors based in Geneva, Lugano, and Zurich. It also acted as a custodian of assets managed by third-party investment advisers and trustees.

6.      Since 2006, HSBC Switzerland provided fiduciary services through HSBC Guyerzeller Trust Company AG[2] and its subsidiaries, which created trusts and nominee entities to hold accounts for the owners. Prior to 2006, HSBC Switzerland provided trust services through HSBC Trust Company AG, a wholly owned subsidiary of HSBC Switzerland, and HSBC Guyerzeller provided similar services through an in-house function and wholly owned corporate services companies. Other wholly owned companies provided directors to manage these entities for the benefit of and at the direction of the owners.

7.      HSBC operated an affinity-marketing program referred to as the Global South Asian Diaspora ("GSAD") until 2012. From 1999 to 2012, the head of GSAD was an employee of HSBC's U.K. private bank and later detailed to HSBC Switzerland. Employees detailed to GSAD sought to recruit wealthy South Asian clients residing around the world to bank at HSBC or to expand their existing banking at HSBC-owned entities. Part of the GSAD program involved actively marketing onshore services in the United States. A few executives and employees assigned to GSAD encouraged U.S. persons to open and maintain bank accounts in Switzerland.

## II.      U.S. INCOME AND TAX REPORTING OBLIGATIONS

8.      U.S. citizens, resident aliens, and legal permanent residents ("U.S. persons") are obligated to report all income earned worldwide, including from foreign bank accounts, on their tax returns and to pay the taxes due on that income. Since 1976, U.S. persons have been obligated to report to the Internal Revenue Service ("IRS") on a Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

9.      Since 1970, U.S. persons who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year, have been required to file a Report of Foreign Bank and Financial Accounts, FinCEN Form 114, formerly known as Form TD F 90-22.1, (the "FBAR") with the Department of the Treasury. The FBAR for the applicable year during the relevant period here was due on June 30 of the following year.

10.     An "undeclared account" is a financial account beneficially owned by an individual subject to U.S. tax obligations and maintained in a foreign country, which the individual did not report to the U.S. government on an income tax return and an FBAR.

11.     Since 1935, Switzerland has maintained criminal laws that ensure the secrecy of client relationships at Swiss banks. Swiss law prohibits the disclosure of identifying information without client authorization, except in certain limited circumstances. Because of the secrecy

---

[2]      HSBC Switzerland is now in the process of closing its trust company, which has been wholly owned by HSBC Switzerland since the merger of HSBC Switzerland and HSBC Guyerzeller. At this time, the trust company is called HSBC Trust Company AG.

guarantee that Swiss bank secrecy laws created, these Swiss criminal provisions have historically enabled U.S. clients to conceal their Swiss bank accounts from U.S. authorities.

## III. OVERVIEW

12.     From at least 2000 to 2010, HSBC Switzerland aided and assisted U.S. persons in evading their U.S. tax obligations, filing false tax returns with the IRS, and concealing their offshore assets and income from U.S. authorities.  HSBC Switzerland did so by opening and maintaining undeclared accounts for U.S. persons, by allowing third-party asset managers to manage undeclared accounts for U.S. persons, and by taking other actions to facilitate U.S. persons in concealing their assets and income and evading taxes.  HSBC Switzerland knew that U.S. persons were maintaining undeclared accounts in violation of U.S. law.  Many of these clients resided in the United States, including in the Southern District of Florida.

13.     In 2002, HSBC Switzerland maintained approximately 720 U.S.-person relationships with approximately $825 million in Assets Under Management ("AUM") for clients that were not declared (hereinafter "undeclared U.S.-person relationships").[3]  Although the number of undeclared U.S.-person relationships declined in the following years, the AUM increased, reaching a peak of $1.26 billion in 2007, as described below.

| Year | Number of Undeclared U.S.-Person Relationships at Year-End | Year-end AUM (in USD $ Millions) |
|------|------------------------------------------------------------|----------------------------------|
| 2002 | 720 | 825 |
| 2003 | 700 | 985 |
| 2004 | 660 | 980 |
| 2005 | 600 | 930 |
| 2006 | 560 | 1035 |
| 2007 | 550 | 1260 |
| 2008 | 540 | 910 |
| 2009 | 375 | 745 |
| 2010 | 265 | 615 |

---

[3]     Undeclared U.S.-person relationships, which are relationships in which the Bank did not have evidence of declared status, comprised less than 2.0% of the HSBC Switzerland's total AUM during the 2002-to-2010 period.  Many of the U.S.-person client relationships open in 2002 were inherited through the acquisitions.  Other clients became U.S. persons after they opened their relationship by, for example, moving to the United States.  If a relationship was open during the relevant period and became U.S. related after it was opened, it is included as a U.S.-person relationship and reflected in the chart for any year that it was open.  HSBC Switzerland also banked declared U.S.-person relationships.  Relationships with an account associated with an IRS Form 1099 or an identified, and timely-filed, FBAR are treated as declared U.S.-person relationships.

14.     U.S.-person accounts included individual accounts that were held in the names of the U.S. persons, sometimes with numerical or coded names. In code-name or numbered accounts, the bank used a code name or number on the customer's account and on any documentation that the customer received from the bank in lieu of referring to the U.S. client by name. These accounts also included accounts where U.S. persons controlled or owned the account through a nominee, including as settlors of trusts or foundations, beneficiaries of those trusts, or the beneficial owner of accounts held in the names of corporations, which were often established in offshore tax-haven jurisdictions with strict secrecy laws.

15.     HSBC Switzerland conducted business with U.S. persons through Bankers and client advisors. At least twenty Bankers traveled to the United States during the 2000s and met with undeclared and declared clients, including meeting clients in the Southern District of Florida. Other times, clients traveled to Switzerland and met with Bankers and client advisors about their accounts.

## IV.    OFFENSE CONDUCT

### A.     HSBC Switzerland Aided and Assisted U.S. Persons in Concealing Assets and Income

16.     HSBC Switzerland provided a variety of traditional Swiss banking services that aided its U.S. clients to help conceal their assets and income from U.S. authorities. HSBC Switzerland Bankers advised clients that they could use HSBC Switzerland's services to conceal income and assets from the U.S. government. The most significant services are set forth below, and some are described in more detail in the sections that follow.

        a.  HSBC Switzerland Bankers on occasion advised clients not to return to the United States carrying more than $10,000 in currency or other monetary instruments to avoid filing Reports of International Transportation of Currency or Monetary Instruments, which might lead U.S. authorities to investigate the source of the funds being transported.

        b.  HSBC Switzerland Bankers assisted U.S. clients in structuring withdrawals from their undeclared accounts via wire transfers in amounts less than $10,000 in an attempt to conceal the transactions, and their undeclared Swiss accounts, from U.S. authorities.

        c.  HSBC Switzerland Bankers assisted U.S. clients to access funds held in their undeclared accounts by providing clients with credit, debit, or travel cards linked to their undeclared accounts. Clients instructed the bank by telephone, mail, or email to load Swiss francs, U.S. dollars, or Euros onto these cards from the client's account at the bank. The clients used the cards for purchases and remitted the unused balances back to their accounts. Bankers cautioned at least a few clients not to use the cards in the United States. Some types of cards did not have the bank or the U.S. client's name on them, and allowed U.S. clients to withdraw funds remotely or pay for goods and services without a clear paper trail back to their undeclared accounts in Switzerland.

4

    d.  HSBC Switzerland Bankers issued checks drawn on HSBC Switzerland's correspondent accounts, including at HSBC Bank USA, in the United States for U.S. clients.  These checks, which were essentially cashier checks, included the name of HSBC Switzerland, but not the client's name or the name of the client's bank account, and were routinely provided to clients. U.S. clients used these checks to obscure the money's origin because such checks could be deposited without disclosing the name or ownership of the Swiss bank account.

    e.  HSBC Switzerland Bankers discouraged U.S. clients from receiving mail, including bank statements, at their homes in the United States.  Instead, the bank held all mail correspondence for those U.S. clients, making their undeclared accounts less likely to come to the attention of the IRS.  Multiple reports made by HSBC Switzerland Bankers following trips to the United States to meet with existing or prospective clients revealed that HSBC Switzerland Bankers frequently advised clients to sign "hold-mail" agreements with the bank in order to avoid detection of their accounts.

    f.  HSBC Switzerland Bankers advised U.S. clients not to transport account documentation from Switzerland back to the United States.  Further, HSBC Switzerland Bankers told their U.S. clients to refrain from phoning the bank from the United States and to place phone calls to their Bankers from locations outside the United States.

**B.    HSBC Switzerland Created and Managed Nominee Entities for U.S. Persons to Help Them Hide Assets and Income**

17.    HSBC Switzerland Bankers advised U.S. persons to open and maintain bank accounts in the names of nominee companies and trusts.  These nominee trusts and companies did not serve any business purpose, but were instead used to conceal the U.S. person's beneficial ownership of the accounts.  By using a trust or corporation, it would appear that those entities, and not the U.S. person, owned and controlled the assets and income of the account.

18.    HSBC Switzerland utilized in-house trust companies or functions—including HSBC Guyerzeller Trust and its predecessors—to create nominee trusts and corporate entities for clients.  HSBC Guyerzeller Trust and other trust services affiliated with HSBC Switzerland created these nominee entities in offshore tax-haven jurisdictions, such as the British Virgin Islands, Liechtenstein, and Panama.

19.    HSBC Switzerland used wholly owned or affiliated companies, including Cordico Management AG, to provide individuals from those tax-haven countries to serve as trustees or directors of the nominee entities.  These trustees and directors employed by HSBC Switzerland's wholly owned or affiliated companies exercised little to no independence.  Rather, they managed the accounts at HSBC Switzerland at the direction of the U.S. persons who beneficially owned the assets in the accounts.

20.     Even in circumstances where HSBC Switzerland did not utilize an in-house company to either create or manage the nominee entities, HSBC Switzerland knew that U.S. persons were the true beneficial owners of the assets in the accounts held in the names of trusts and corporate entities. HSBC Switzerland Bankers knowingly accepted IRS Forms W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individual)), or HSBC Switzerland's substitute forms, provided by the directors of nominee companies and trustees of the trusts who falsely represented under penalty of perjury that the companies and trusts, and not the U.S. persons, were the beneficial owners of the assets for tax reporting purposes.

## C.     The Qualified Intermediary Agreement

21.     In 2001, HSBC Switzerland entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS. Agreements under the Qualified Intermediary regime provided a framework for U.S. information reporting and tax withholding by a non-U.S. financial institution with respect to U.S. securities. The QI Agreements were intended to ensure that, with respect to U.S. securities held in an account at the bank, non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons holding U.S. securities were properly paying U.S. tax. QI Agreements, however, were also limited in scope and did not address non-U.S. securities and did not replace or supplant U.S. tax, securities, and criminal laws that also applied to a bank's conduct.

22.     The QI Agreement took account of the fact that Swiss law prohibited HSBC Switzerland, like other Swiss banks, from disclosing the identity of an account holder. In general, if an account holder wanted to trade in U.S. securities and avoid mandatory U.S. tax withholding, the agreement required HSBC Switzerland to obtain the consent of the account holder to disclose the client's identity to the IRS. The QI Agreement required HSBC Switzerland to obtain IRS Forms W-9 and to undertake IRS Form 1099 reporting for new and existing U.S. clients engaged in U.S. securities transactions.

23.     In an effort to avoid the QI Agreement's reporting requirements, some HSBC Switzerland Bankers encouraged their U.S. clients to create and open accounts in the names of offshore entities. Consistent with all other Swiss-located banks, HSBC Switzerland treated these foreign nominee entities as the owners of the assets, despite the beneficial owners being identified on Forms A and similar documents maintained by the bank. HSBC Switzerland did not report the U.S. persons' ownership of these accounts to the IRS. In some instances, Bankers knowingly accepted false information from account holders, settlors, and beneficial owners regarding their citizenship or residence.

24.     After acquiring Republic Bank in 1999, the predecessor of HSBC Switzerland—but not HSBC Guyerzeller—continued Republic Bank's policy requiring U.S. clients to sign a U.S. Bank Secrecy waiver. Despite obtaining waivers from a number of U.S. clients, HSBC Switzerland did not use these waivers to report U.S.-person accounts or income earned on the accounts to the IRS. HSBC Switzerland did not change its stance towards U.S. tax compliance or consistently reject clients who refused to sign a waiver.

25.    In 2004, HSBC Guyerzeller sought to reduce its exposure to the U.S. market.  It decided to stop opening new relationships for U.S.-resident clients, to close accounts with AUM less than $750,000, and to require new clients to sign a U.S. Bank Secrecy waiver, which HSBC Switzerland already required.  HSBC Guyerzeller did not, however, change its stance towards tax compliance.  In order to appear to distance itself from the tax evasion scheme, the bank adopted a new policy regarding the management of nominee trusts and other entities.  That policy required the bank to shift management of approximately 20 entities connected to a few relationships from its in-house service providers to outside providers.  As noted in the minutes of a managing committee meeting, the new policy required that third parties manage structures that were "not tax compliant (*i.e.*, the funds are not reported to the IRS)."  Even though the bank knew that those U.S. clients were evading their taxes, it did not close the accounts.

26.    The new policy required an outside provider to manage the entities and accounts used by U.S. persons to evade their taxes.  However, for a few relationships, HSBC Guyerzeller recommended an individual ("Fiduciary 1"), who had been an employee of HSBC Guyerzeller in the 1990s and owned and operated companies that provided fiduciary and asset management services, to manage the entities.

### D.    HSBC Switzerland Created a North American Desk to Service Accounts for U.S. Persons and Others

27.    Prior to 2004, more than 100 Bankers managed a mix of U.S.-person and non-U.S.-person clients.  In general, those Bankers managed only a small number of clients who were U.S. persons.  In 2004, HSBC Switzerland management created a North American desk, generally staffed by four or five Bankers to focus on pre-existing U.S. clients (and also the clients of another country) and to help implement and follow U.S. Qualified Intermediary documentation requirements and SEC securities rules and regulations.  Despite creating this new desk, HSBC Switzerland was slow to transfer all U.S.-person accounts to be handled by the desk.

28.    Between 2005 and 2007, at least four Bankers on the North American desk traveled to the United States to meet at least 25 different clients, and took at least eleven trips to the United States.  During these trips, HSBC Switzerland Bankers on the North American desk met with undeclared clients and prospective U.S. persons in an effort to obtain new clients.  The following are illustrative examples:

        a.  During a trip to the United States in 2006, Banker A discussed with a U.S. client the provision of a credit card linked to the client's account for an upcoming trip to Europe.  When the client asked if the card could be used to withdraw funds in the United States, Banker A counseled the client not to use the card in the United States "to avoid any risks."

        b.  In 2006, Banker B attended Design Miami in an effort to recruit prospective clients.

        c.  In 2007, Banker A and Banker C planned a trip to the United States wherein Banker C was to stay in the United States for a month.  Banker A wrote in an

7

email that Banker C's mission was "to contact a maximum of prospects and existing clients."

29.     Some Bankers not assigned to the North American desk who retained U.S. clients despite the efforts at consolidation also traveled to the United States to meet with their clients.

### E.     HSBC Switzerland Exits the U.S. Cross-Border Business

30.     In early 2008, it became public that the U.S. government had opened a criminal investigation of UBS AG, the largest bank in Switzerland, for tax and securities violations in connection with its maintaining undeclared accounts for U.S. clients. After learning this information, HSBC Switzerland did not immediately cease its own cross-border business with U.S. persons, but began a series of policy changes that ultimately culminated in HSBC Switzerland's exit from the business.

31.     At first, HSBC Switzerland's management-instructed Bankers not to accept clients who were fleeing UBS in the wake of the investigation. Despite this directive, some Bankers assisted a few UBS clients to transfer their undeclared funds to HSBC Switzerland.

32.     In June 2008, HSBC Switzerland made its policy towards U.S. persons more stringent, as later memorialized in an October 2008 document. The policy stated that U.S.-resident accounts could only be opened in "exceptional circumstances" and stated that entity accounts for non-residents must include evidence that the "account is not for tax avoidance." The document circulating the new policy stated that "US authorities" were taking "a tougher stance on tax avoidance and on breaches of investment regulations."

33.     In February 2009, HSBC Switzerland decided to close accounts for U.S. persons who had $1 million or less in AUM. HSBC Switzerland permitted those U.S. clients holding more that $1 million to keep their accounts only if they signed a Form W-9, a waiver of Swiss bank secrecy, and a declaration of tax compliance. The declaration of tax compliance required the client to identify how they were declaring their account and listed the various U.S. tax reporting obligations.

34.     Even after HSBC Switzerland had begun forcing its U.S. clients with undeclared accounts to exit the bank, HSBC Switzerland Bankers assisted clients in closing their accounts in a manner that continued to conceal their offshore assets. Some Bankers directed their clients to other Swiss banks that were continuing to accept undeclared accounts.

35.     In some other instances, HSBC Switzerland Bankers allowed clients to close their accounts and withdraw the contents in cash, although bank management asked Bankers to advise clients not to do so. Clients who withdrew cash at account closing often did so to limit the paper trail between them and their undeclared accounts. For example, according to U.S. court filings, Andrew Silva, a U.S. person who inherited a share of an undeclared account held in the name of a trust with two other persons, received $100,000 in cash from HSBC Switzerland's office in Zurich in 2009. He did so following a meeting with an external lawyer, who had served as his external advisor for a decade, and who told him to withdraw the money in cash and provided him with envelopes to mail it to the United States. According to Mr. Silva, when he collected the cash, the bank advised him that it would not wire money to the United States because that would

leave a record of the transfer. Silva then mailed the cash to himself in the United States in a series of packages, each containing less than $10,000, in an attempt to evade currency-reporting requirements. After Silva pleaded guilty in the United States, HSBC Switzerland implemented a March 2010 policy to limit the amount of cash that a client could withdraw.

36.     In December 2010, HSBC Switzerland management decided to renew its effort to close U.S.-person accounts, even those known to be declared, with limited exceptions for fully documented non-resident U.S. person accounts with AUM greater than $5 million. HSBC Switzerland set out a specific closing process prohibiting certain types of transactions that could be used by clients to conceal undeclared assets, and it retained an accounting firm to support the closing process.

### F.     Examples of Misconduct

37.     Examples of the misconduct described generally above include the following specific instances of misconduct involving various HSBC Switzerland Bankers and U.S. clients:

    a.  Client 1

        i.  In approximately 1996, Client 1 and her siblings inherited the funds in a HSBC Switzerland account. At that time, Banker D and Banker E assisted Client 1 in opening an account at HSBC Switzerland in order to hold her share of the inherited funds. Banker E advised Client 1 to open the account in the name of a corporation in a tax-haven country, which in turn would be owned by a trust in a different tax-haven country. Banker E used HSBC Guyerzeller Trust to form the trust and provide trustees to manage the trust. Cordico Management AG provided nominee directors to manage the corporation and the account. Banker E advised Client 1 that this structure would make it less likely that the IRS would detect her ownership of the account.

        ii.  Although the Cordico directors nominally managed the corporation, Client 1 and her spouse freely accessed the funds in the account through direct communication with the Banker.

        iii. Bankers gave Client 1, her spouse, and their children immediate access to the funds in the offshore account by providing them with credit cards linked to the account.

        iv.  On numerous occasions in 2002 through 2006, at the command of Client 1, Bankers bid on and purchased works of art for sale at auction houses and galleries outside of the United States, and made a payment to a luxury vacation package provider, directly from Client 1's HSBC Switzerland account.

        v.  In 2007, after HSBC Switzerland ceased using its wholly owned subsidiaries to manage trusts and entities for U.S. persons, the bank

transferred management of the corporation to Fiduciary 1, who was a former employee of HSBC Guyerzeller.

b. Client 2

    i. In 2003, Banker F solicited the business of Client 2 and convinced him to transfer some of his assets to HSBC Switzerland. Client 2 and his spouse had accounts with at least three other Swiss banks.

    ii. Banker F advised Client 2 to set up his account in the name of a personal investment company established in Panama. Banker F and his successor, Banker G, both advised Client 2 not to call them from a line in the United States and not to take account statements he obtained in Switzerland back to the United States.

    iii. Client 2 closed his account in 2009, around the time that HSBC Switzerland began closing U.S. accounts.

c. Client 3

    i. Client 3 had an account at HSBC Switzerland from 1990 until 2009, which was funded by money received from his non-U.S. person family. In 2000, Client 3's Banker, Banker H advised him that if he wished to continue to invest in U.S. securities, Client 3 needed to transfer his assets to an account held in the name of a company not associated with Client 3. Banker H suggested using a British Virgin Islands corporation; however, no corporation was formed.

    ii. Banker H instructed Client 3 not to call Banker H from inside the United States.

    iii. Banker H provided Client 3 with a travel cash card that was periodically replenished with funds from Client 3's undeclared account. Client 3 used the card to withdraw cash from ATM machines in the United States and Europe.

    iv. Client 3 closed his account in 2009, around the time that HSBC Switzerland began closing U.S. accounts.

d. Client 4

    i. A Banker spoke with Client 4 by phone and advised her to use "hold-mail" services. The Bank received Client 4's permission to not send mail to the client's U.S. address. The Banker noted that Client 4 had not declared her account to the IRS.

    ii. HSBC Switzerland identified the account for closure in 2009.

e. Client 5

    i. In 2008, during the time that UBS was actively exiting U.S. account holders, Client 5, who had an account at UBS, contacted Banker I and explained that he needed to leave UBS.

    ii. Banker I opened an account for Client 5 in the name of a Panamanian corporation. Neither Client 5 nor Banker I disclosed Client 5 as a U.S. person when opening the relationship. In 2009, when bank management determined that Client 5 was a U.S. person, it directed that the client close his relationship.

    iii. In September 2009, Banker I assisted Client 5 in transferring the assets from his HSBC Switzerland account to an account at a bank in Israel.

f. Client 6

    i. In approximately 2006, Client 6 opened an account at HSBC Switzerland in the name of a foundation with a non-U.S. person listed as beneficial owner. He funded this account with an approximately $20 million transfer from a different Swiss bank. Client 6 met with Banker J in Zurich to open the account. Client 6 usually visited Zurich annually to meet with his Bankers about the account.

    ii. In 2009, in order to keep his account at HSBC Switzerland, Client 6 transferred his funds to an account in the name of his girlfriend, who was a citizen of Hong Kong. Bankers assured Client 6 that the account would not be disclosed to U.S. authorities and that, despite HSBC Switzerland's stated policy, they were willing to do business with Client 6 as long as the account was held in his girlfriend's name.

g. Sanjay Sethi

    i. In 2001, a GSAD Banker in New York City assisted Sanjay Sethi in opening an undeclared account in India, using Sethi's Indian passport as identification.

    ii. In 2002, Executive A, who led the GSAD program, met with Sethi at HSBC's offices in New York City. Executive A convinced Sethi to open an account at HSBC Switzerland, explaining that Swiss bank secrecy would protect the account from disclosure. Executive A explained that the secrecy laws would not apply for terrorist financing or "dirty money," but that Swiss judges would reject a request from the IRS that was based on tax evasion.

      iii. Executive A assisted Sethi in opening his undeclared account in the name of a sham trust that was, in turn, owned by a sham company in the British Virgin Islands. Executive A assured Sethi that the structure would allow his money to grow, tax-free, in a manner that would not be known to the IRS. In 2003, Executive A assisted Sethi in opening an account at HSBC in the United States in the name of a sham Cayman Islands corporation, with a foreign person's name listed as the beneficial owner of the account, even though both knew that Sethi was the true owner of the account.

      iv. In approximately 2007, Sethi met with Banker K at a hotel in New York City to discuss his account. Banker K told Sethi they could not meet in an HSBC office because "this business is quiet."

### G. Voluntary Remedial Measures and Cooperation

38.    HSBC Switzerland, with the support of other HSBC-owned or controlled entities, has undertaken substantial remedial measures and extensively cooperated with the Department of Justice and IRS's investigation of the offenses detailed above. These measures include the following:

39.    HSBC contacted the Department of Justice in December 2008, prior to the resolution of the UBS investigation and years before the U.S. Swiss Bank Program.

40.    HSBC Switzerland conducted a thorough and full internal investigation and self-reported its misconduct.

41.    HSBC has facilitated the disclosure of client information and has cooperated in the prosecution of several former clients in the United States.

42.    HSBC Switzerland also recommended participation in the IRS Offshore Voluntary Disclosure Program ("OVDP") in writing in 2011 and retained a Swiss law firm and a Swiss accounting firm to conduct an extensive outreach program to contact clients and encourage OVDP participation.

43.    HSBC Switzerland advocated in favor of a decision made by the Swiss Federal Council in April 2012 to allow it and other banks to produce certain information to the Department of Justice and subsequently produced that information to the Department almost immediately in May 2012.

44.    HSBC Switzerland implemented new policies and procedures intended to protect against the use of its services for tax evasion. These initiatives included policies limiting cash withdrawals and discontinuing the use of holdmail, as well as a tax transparency policy that required a review of accounts against possible indicia of tax evasion and the closure of any account with unresolved issues. HSBC Switzerland has also implemented FATCA and the Common Reporting Standard.

12

45.     HSBC substantially restructured HSBC Switzerland.  Since 2009, the senior management of HSBC Switzerland has changed substantially, with a complete overhaul of its management team.  In addition to effectively exiting the U.S. market, HSBC Switzerland has also substantially reduced the total number of markets and clients it serves.  HSBC Switzerland now has fewer than 5,000 accounts in total.  This is a decrease of more than 85 percent since the late 2000s.

# EXHIBIT D
# TO THE
# DEFERRED
# PROSECUTION
# AGREEMENT

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

UNITED STATES OF AMERICA,

     Plaintiff,

v.

SEVENTY-ONE MILLION EIGHT HUNDRED
FIFTY THOUSAND ($71,850,000.00)
IN UNITED STATES CURRENCY,

     Defendant *in Rem.*

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America ("the United States"), through undersigned counsel,

hereby files this Verified Complaint ("the Complaint") for Forfeiture *In Rem* against Seventy-One

Million Eight Hundred Fifty Thousand ($71,850,000.00) in United States currency (the

"Defendant Currency"), and in support thereof alleges as follows.

## JURISDICTION AND VENUE

1.    This action is brought by the United States of America pursuant to Title 18, United

States Code, Section 981(a)(1)(C), seeking the forfeiture of the Defendant Currency.

2.    This Court has jurisdiction pursuant to Title 28, United States Code, Section 1355.

3.    Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A),

because certain acts and omissions giving rise to the forfeiture took place in the Southern District

of Florida, and pursuant to Title 28, United States Code, Section 1395(c), because the Defendant

Currency is located in the Southern District of Florida.

4.      The Defendant Currency represents property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Section 1343, and property traceable to such property, and is therefore subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## PROBABLE CAUSE FOR FORFEITURE

5.      HSBC Private Bank (Suisse) SA ("HSBC Switzerland"), a financial institution incorporated and domiciled in Switzerland, with its headquarters in Geneva, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia,* HSBC Switzerland agreed to forfeit a total of $71,850,000.00 in United States currency, the Defendant Currency, to the United States.   The Defendant Currency is the substitute res for the gross proceeds derived as a result of the commission of the offense. The Deferred Prosecution Agreement, with the accompanying Statement of Facts and Information, are attached and incorporated herein by reference, as Composite Exhibit A.

## CLAIM FOR FORFEITURE

6.      The allegations contained in paragraphs one through five of this Complaint are incorporated by reference herein.

7.      Title 18, United States Code, Section 981(a)(1)(C), subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of... any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.      "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7) to include any offense under Title 18, United States Code, Section 1961(1). Section

2

1961(1) lists, among others offenses, violations of Title 18, United States Code, Section 1343 (wire fraud).

9.     Based on the foregoing, the Defendant Currency is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), as it is substitute *res* for property derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

WHEREFORE, Plaintiff United States of America requests that process issue to enforce the forfeiture of the Defendant Currency, and that all persons having an interest in the Defendant Currency be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Currency to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

/s/ *Danielle Croke*
Danielle N. Croke
Assistant United States Attorney
Florida Bar No. 0723258
E-mail: danielle.croke@usdoj.gov
U. S. Attorney's Office
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132
Telephone: (305) 961-9420
Facsimile: (305) 536-7599

RICHARD E. ZUCKERMAN
PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL
TAX DIVISION

/s/ *Mark F. Daly*
Mark F. Daly
Senior Litigation Counsel
Court ID No. A5501435
E-mail: mark.f.daly@usdoj.gov
Tax Division 01 D Street NW – Room 7334
601 D Street NW – Room 7334
Washington, DC 20004
Telephone: (202) 616-2245
Facsimile: (202) 616-1786

/s/ *Jason Poole*
Jason Poole
Assistant Chief

3

Court ID No. A5501525
jason.h.Poole@usdoj.gov
Tax Division 01 D Street NW – Room 7334
601 D Street NW – Room 7334
Washington, DC 20004
Telephone: (202) 616-2245
Facsimile: (202) 514-0302

4

## **VERIFICATION**

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and Composite Exhibit A, and state that the facts alleged therein are true and correct to the best of my knowledge and belief.

The sources of deponent's information and the grounds of her belief are her personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed this _____ day of December, 2019.

_____
Christine Puglisi, Special Agent
United States Internal Revenue Service

5

# EXHIBIT A
# TO VERIFIED
# COMPLAINT FOR
# FORFEITURE IN
# REM

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-60359-CR-ALTMAN/HUNT
### 18 U.S.C. § 371

### UNITED STATES OF AMERICA

v.

### HSBC PRIVATE BANK (SUISSE) SA,

Defendant.

_____/

## DEFERRED PROSECUTION AGREEMENT

The Tax Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Florida (collectively, the "Office") and defendant HSBC Private Bank (Suisse) SA ("HSBC Switzerland" or the "Bank"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

This Agreement shall take effect upon its execution by both parties.

## THE CRIMINAL INFORMATION

1.      HSBC Switzerland waives indictment and consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of Florida (the "Court"), charging HSBC Switzerland with conspiring with others, including U.S. persons, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"), (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201. A copy of the Information is attached hereto as Exhibit B.

## ACCEPTANCE OF RESPONSIBILITY

2.      HSBC Switzerland admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate. HSBC Switzerland further admits and stipulates that the acts labeled "overt acts" in Paragraph 13 of the Information in fact took place. In sum, HSBC Switzerland admits that it is responsible under United States law for the acts of its officers, employees, and agents and that the allegations of

federal criminal violations charged in the Information and set forth in the Statement of Facts as a result of those acts are true and accurate.

### RESTITUTION, FORFEITURE, AND PENALTY OBLIGATIONS

3.      As a result of the conduct described in the Information and the Statement of Facts, HSBC Switzerland agrees to make payments in total of $192,350,000 to the United States. Specifically, HSBC Switzerland agrees to (1) make a payment of restitution in the amount of $60,600,000 (the "Tax Restitution Amount"), (2) forfeit $71,850,000 (the "Forfeiture Amount") to the United States, and (3) pay a penalty of $59,900,000 (the "Penalty Amount") to the U.S. Department of Justice (the "Department"), as set forth below.

### Restitution

4.      In regard to the Tax Restitution Amount, HSBC Switzerland admits that the Tax Restitution Amount represents the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts. The Tax Restitution Amount shall not be further reduced by payments that have been made or may be made to the United States by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement. HSBC Switzerland agrees to pay the Tax Restitution Amount to the IRS by wire transfer within fourteen (14) days of the date of the execution of this Agreement. If HSBC Switzerland fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 20 and 21, below.

### Forfeiture

5.      The Forfeiture Amount of $71,850,000 represents approximate gross fees paid to HSBC Switzerland by U.S. taxpayers with undeclared accounts at HSBC Switzerland from 2002 through December 31, 2009. HSBC Switzerland agrees, pursuant to Title 18, United States Code, Section 981(a)(1)(C) that it will forfeit to the United States the Forfeiture Amount.

6.      The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within fourteen (14) days of the execution of this Agreement. If HSBC Switzerland fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 20 and 21, below.

7.      Upon payment of the Forfeiture Amount, HSBC Switzerland shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. HSBC Switzerland agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount or the payment of the Penalty Amount and will not assist a third party in asserting any claim to the Forfeiture Amount or the Penalty Amount.

2

8.       HSBC Switzerland agrees this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, HSBC Switzerland expressly waives service of that Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Forfeiture Amount. HSBC Switzerland also agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

## Penalty

9.       The Office and HSBC Switzerland agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), and in light of the Forfeiture Amount and the Tax Restitution Amount, the Penalty Amount of $59,900,000 is an appropriate penalty. HSBC Switzerland agrees to pay the Penalty Amount as directed by the Office within fourteen (14) business days of the date of the execution of this Agreement. The Penalty Amount represents a reduction of approximately 50% from the low end of the fine range that the parties agree would be applicable under the United States Sentencing Guidelines if HSBC Switzerland had been convicted and sentenced for its criminal conduct. The Office and HSBC Switzerland agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of HSBC Switzerland's conduct as set forth in the Statement of Facts, and also, in mitigation of a higher penalty, among other things, HSBC Switzerland's self-reporting its conduct to the Office, performing a thorough internal investigation, providing client identifying information to the Office and extensively cooperating in a series of investigations and prosecutions, as well as the facts set forth in Paragraphs 38 through 45 of the Statement of Facts. The Office and HSBC Switzerland further agree that the Penalty Amount is final and shall not be refunded, that nothing in this Agreement shall be deemed an agreement by the Office that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and that the Office is not precluded from arguing in any future prosecution that the Court should impose a higher penalty. Under those circumstances, the Office agrees that it will recommend to the Court that HSBC Switzerland's payment of the Penalty Amount, pursuant to the Agreement, should be credited toward any fine ordered by the Court as part of a future judgment.

## Non-Deductibility

10.       HSBC Switzerland agrees that the Tax Restitution Amount, the Forfeiture Amount and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States government for all tax purposes under United States law. HSBC Switzerland agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $192,350,000 that HSBC Switzerland has paid to the United States pursuant to this Agreement.

## TERM OF THE AGREEMENT

11.       HSBC Switzerland agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date

3

thereof, unless otherwise extended pursuant to Paragraph 12 below (the "Deferral Period"). HSBC Switzerland's obligation to cooperate is not intended to apply in the event that a prosecution against HSBC Switzerland by this Office is pursued and not deferred.

12.     HSBC Switzerland agrees that, in the event that the Office determines during the Deferral Period described in Paragraph 11 above (or any extensions thereof) that HSBC Switzerland has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Office, up to an additional 1 year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four years.

## DEFERRAL OF PROSECUTION

13.     HSBC Switzerland has made a commitment to:  (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Office and the IRS (as provided herein in Paragraphs 15 through 17); (c) make the payments specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 15(f)); and (e) otherwise comply with all of the terms of this Agreement.  In consideration of the foregoing, the Office shall recommend to the Court that prosecution of HSBC Switzerland on the Information be deferred for three years. HSBC Switzerland shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of Florida for the period during which this Agreement is in effect.

14.     The Office agrees that if HSBC Switzerland is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against HSBC Switzerland pursuant to this Agreement.  Except in the event of a violation by HSBC Switzerland of any term of this Agreement or as otherwise provided in Paragraph 20, the Office will bring no additional charges or other civil action against HSBC Switzerland relating to its conduct as described in the Information or Statement of Facts.  This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual nor entity other than HSBC Switzerland, its predecessors such as HSBC Guyerzeller AG, and its subsidiaries, or its affiliated entities that provide banking services in Switzerland.  HSBC Switzerland and the Office understand that the Court must approve deferral under the Speedy Trial Act, in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court decline to defer prosecution for any reason:  (a) both the Office and HSBC Switzerland are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 20, below; and (c) if they have already been transferred to the United States, the Tax Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to HSBC Switzerland.

4

## COOPERATION

15.    During the Deferral Period, HSBC Switzerland shall cooperate fully, subject to applicable laws and regulations, with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding all matters related to the Office's investigation into U.S.-related accounts banking in Switzerland at HSBC Switzerland (the "Office's Investigation") about which HSBC Switzerland has information or knowledge, including:

(a) truthfully and completely disclose all information with respect to the activities of HSBC Switzerland, its officers and employees, and others concerning all such matters about which this Office inquires related to this Office's Investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law;

(b) specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Swiss Bank Program") as set forth specifically in Parts II.D.1(a)-(d) and 2 of the Program;

(c) expand, as soon as practicable, transaction information previously produced in response to requests based on Part II.D.2.b.vi of the Swiss Bank Program, by six months to include accounts closed in the period from January 1, 2009 through December 31, 2017;

(d) make reasonable efforts to bring accounts of recalcitrant account holders, as defined in Title 26, United States Code, Section 1471(d)(6), into tax compliance, and, if such reasonable efforts are unsuccessful, then to implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Swiss Bank Program;

(e) truthfully and completely disclose, and continue to disclose during the Deferral Period, consistent with applicable law and regulations, all information described in Part II.D.1(a)-(d) of the Swiss Bank Program with respect to U.S.-related accounts held by HSBC Switzerland and any statistical data that would have been relevant to the calculation of Forfeiture and Tax Restitution Amounts from 2002 through 2009 that is not protected by a valid claim of privilege or work product with respect to the activities of HSBC Switzerland and its officers, directors, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement.  Subject to applicable laws and regulations, HSBC Switzerland shall disclose to the Tax Division that it has discovered new information required to be disclosed under this Agreement, including pursuant to this paragraph and paragraph 15(b) and (c), no later than thirty days from discovery and provide such information, including information as described in Part II.D.1(a)-(d) of the Program and information pursuant to paragraph 15(b) and (c) of this Agreement, no later than ninety days from discovery.  All other terms of this Agreement shall apply with respect to any newly disclosed information; and

(f) HSBC Switzerland shall commit no violations of the federal criminal laws of the United States.

16.     It is further understood that during the Deferral Period, HSBC Switzerland will bring, consistent with applicable laws or regulations, to this Office's attention: (a) all criminal conduct by, and criminal investigations of, HSBC Switzerland or its employees related to any violations of the federal laws of the United States that come to the attention of HSBC Switzerland's board of directors, executive committee, or senior management, and (b) any investigation conducted by, or any civil, administrative, or regulatory proceeding brought by, any U.S. governmental authority that alleges fraud by HSBC Switzerland or any other violations of the federal laws of the United States in the operation or management of HSBC Switzerland's business.

17.     Notwithstanding the Deferral Period, HSBC Switzerland shall also, subject to applicable laws or regulations, continue to cooperate with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding any and all matters related to the Office's Investigation until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether those examinations, investigations, or proceedings are concluded within the Deferral Period, including:

> (a) cooperate fully with the Office, the IRS, and any other federal law enforcement agency designated by the Office regarding all matters related to the Office's Investigation;
>
> (b) retain all records relating to the Office's Investigation, for a period of 10 years from the end of the Deferral Period;
>
> (c) provide all necessary information and assist the United States with the drafting of treaty requests seeking account information for accounts owned and/or controlled by U.S. persons, and collect and maintain all records that are potentially responsive to such treaty requests in order to facilitate a prompt response;
>
> (d) assist the Office or any designated federal law enforcement agency in any investigation, prosecution, or civil proceeding arising out of or related to the Office's Investigation by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding;
>
> (e) use its best efforts promptly to secure the attendance and truthful statements or testimony or information of any current or former officer, director, employee, agent, or consultant of HSBC Switzerland at any meeting or interview or before any grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Office's Investigation;
>
> (f) provide testimony of a competent witness as needed to enable the Office and any designated federal law enforcement agency to use the information and evidence obtained pursuant to HSBC Switzerland's cooperation with the Office before a grand

jury or at any trial or other court proceeding regarding matters arising out of or related to the Office's Investigation;

(g) provide the Office, upon request, consistent with applicable law and regulations, all information, documents, records, or other tangible evidence not protected by a valid claim of privilege or work product regarding matters arising out of or related to the Office's Investigation about which the Office or any designated federal law enforcement agency inquires, including the translation of significant documents at the expense of HSBC Switzerland; and

(h) provide to any state law enforcement agency such assistance as may reasonably be requested in order to establish the basis for admission into evidence of documents already in the possession of such state law enforcement agency in connection with any state civil or criminal tax proceedings brought by such state law enforcement agency against an individual arising out of or related to the Office's Investigation.

18.     HSBC Switzerland agrees to use best efforts to close, as soon as practicable, and in no event later than the end of the Deferral Period, any and all accounts owned and/or controlled by U.S. persons that have been classified as "dormant" in accordance with applicable Swiss laws, regulations and guidelines, and will provide periodic reporting upon request of the Office if unable to close any dormant accounts within that time period. HSBC Switzerland will only provide banking or securities services in connection with any such "dormant" account to the extent that such services are required pursuant to applicable Swiss laws, regulations and guidelines. If at any point contact with the account holder(s) (or other persons(s) with authority over the account) is re-established, HSBC Switzerland will promptly proceed to follow the procedures described above in Paragraph 15(d).

19.     Nothing in this Agreement shall require HSBC Switzerland to waive any protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless HSBC Switzerland voluntarily chooses to waive any such privilege. Nothing in this Agreement shall require HSBC Switzerland to violate the law of any jurisdiction in which it operates.

## BREACH OF THE AGREEMENT

20.     It is understood that should the Office in its sole discretion determine during the Deferral Period that HSBC Switzerland:  (a) has knowingly given materially false, incomplete or misleading information either during the Deferral Period or in connection with the Office's Investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise knowingly violated any provision of this Agreement, HSBC Switzerland shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.  Any such prosecution or civil action may be premised on any information provided by or on behalf of HSBC Switzerland to the Department or the IRS at any time.  In any prosecution or civil action based on the Information,

the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and HSBC Switzerland), and excluding the period from the execution of this Agreement until its termination; and (b) HSBC Switzerland agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 12 above.  By this Agreement, HSBC Switzerland expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay.  Such waivers are knowing, voluntary, and in express reliance on the advice of HSBC Switzerland's counsel.

21.     It is further agreed that in the event that the Office, in its sole discretion, determines that HSBC Switzerland has knowingly violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of HSBC Switzerland to the Office, the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by HSBC Switzerland or by any agent of HSBC Switzerland before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against HSBC Switzerland; and (b) HSBC Switzerland shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of HSBC Switzerland before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.  It is the intent of this Agreement to waive any and all rights in the foregoing respects.

22.     HSBC Switzerland, having admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any public statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.  Any such contradictory statement by HSBC Switzerland, through its present or future attorneys, agents, or employees, shall constitute a violation of this Agreement, and HSBC Switzerland thereafter shall be subject to prosecution as specified in Paragraphs 20 and 21, above, or the Deferral Period shall be extended pursuant to Paragraph 12, above.  The decision as to whether any such contradictory statement will be imputed to HSBC Switzerland for the purpose of determining whether HSBC Switzerland has violated this Agreement shall be within the sole discretion of the Office.  Upon the Office's notifying HSBC Switzerland of any such contradictory statement, HSBC Switzerland may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office.  HSBC Switzerland consents to the public release by the Office, in its sole discretion, of any such repudiation.  The Office agrees that nothing in this Agreement in any way prevents HSBC Switzerland from taking good faith positions, raising defenses, or asserting affirmative claims that are not inconsistent with the Statement of Facts in any civil proceedings, investigations, or litigation involving private parties or government entities, including non-U.S. litigations or non-U.S. investigations.  Nothing in this Agreement is meant to affect the obligation of HSBC

8

Switzerland or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

23.    HSBC Switzerland agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in Paragraphs 20 and 21 above, or instead to choose to extend the period of deferral of prosecution pursuant to Paragraph 12. HSBC Switzerland understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that HSBC Switzerland has violated this Agreement, the Office shall provide prompt written notice to HSBC Switzerland of that determination and provide HSBC Switzerland with a 30-day period from the date of receipt of notice in which to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by HSBC Switzerland.

## ADDITIONAL PROVISIONS

### Limits of the Agreement

24.    It is understood that this Agreement is binding on the Office but does not bind any other components of the Department, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by HSBC Switzerland or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of HSBC Switzerland, and HSBC Switzerland's compliance with its obligations under this Agreement.

### Public Filing

25.    The Office and HSBC Switzerland agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of Florida.

26.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

27.    This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

**Integration Clause**

28.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between HSBC Switzerland and the Office.  This Agreement supersedes all prior understandings or promises between the Office and HSBC Switzerland.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, HSBC Switzerland's attorneys, and a duly authorized representative of HSBC Switzerland.

Agreed and accepted to:

For the United States of America:

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General for Criminal Matters
Tax Division


By:_____          _____
Mark F. Daly                                         Date
Senior Litigation Counsel
Jason H. Poole
Assistant Chief
Grace Albinson
Trial Attorney

For HSBC Switzerland:


_____          _____
ALEXANDER CLASSEN                                Date
Chief Executive Officer, HSBC Switzerland


_____          _____
RACHEL MATTATIA                                  Date
General Counsel, HSBC Switzerland


_____          _____
MATTHEW B. HOLMWOOD                          Date
WilmerHale LLP
Attorney for HSBC Switzerland

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60359-CR-ALTMAN/HUNT
18 U.S.C. § 371

UNITED STATES OF AMERICA

v.

HSBC PRIVATE BANK (SUISSE) SA,

        Defendant.
_____/

## STATEMENT OF FACTS

**I.     BACKGROUND**

1.      HSBC Private Bank (Suisse) SA ("HSBC Switzerland") is incorporated and domiciled in Switzerland, with its headquarters in Geneva.  HSBC Switzerland is an operating bank subsidiary of HSBC Private Bank Holdings (Suisse) SA, a Swiss-based holding company.[1]  At all relevant times, HSBC Switzerland had its own Board of Directors, Chief Executive Officer, Management Executive Committee, and Legal and Compliance functions.

2.      HSBC Switzerland was incorporated in 2001.  It is the product of a series of acquisitions and mergers.  In 1999, HSBC acquired Republic National Bank of New York ("Republic Bank") and Safra Republic Holdings SA.  In 2009, HSBC Switzerland merged with HSBC Guyerzeller Bank Ltd. ("HSBC Guyerzeller").

3.      HSBC Guyerzeller was a Swiss private bank that was wholly owned by HSBC Private Bank Holdings (Suisse) SA.  HSBC acquired a majority share of HSBC Guyerzeller in 1992 as part of its acquisition of Midland Bank, a U.K.-based bank that owned HSBC Guyerzeller.  In 2002, HSBC integrated HSBC Guyerzeller with Credit Commercial de France (Suisse) SA and Handelsfinanz-CCF Bank, the private Swiss bank businesses of Crédit Commercial de France, which HSBC had acquired in 2000.  HSBC Guyerzeller maintained a head office in Zurich, and branches in Geneva and Lugano, as well as representative offices in Hong Kong and Istanbul.  Prior to the 2009 merger, HSBC Guyerzeller operated separately from HSBC Switzerland.

4.      Throughout this statement of facts, HSBC Switzerland is used to refer to the current HSBC Switzerland and any of its predecessor entities.  When relevant, the names of specific predecessor banks are used.

5.      HSBC Switzerland provided private banking and asset management services to individuals and entities resident both inside and outside of Switzerland, including U.S. persons.  HSBC Switzerland provided these services through relationship managers ("Bankers") and other

---

[1]      HSBC Switzerland is indirectly owned by HSBC Holdings plc, a U.K.-based holding company ("HSBC").

client advisors based in Geneva, Lugano, and Zurich. It also acted as a custodian of assets managed by third-party investment advisers and trustees.

6.    Since 2006, HSBC Switzerland provided fiduciary services through HSBC Guyerzeller Trust Company AG[2] and its subsidiaries, which created trusts and nominee entities to hold accounts for the owners. Prior to 2006, HSBC Switzerland provided trust services through HSBC Trust Company AG, a wholly owned subsidiary of HSBC Switzerland, and HSBC Guyerzeller provided similar services through an in-house function and wholly owned corporate services companies. Other wholly owned companies provided directors to manage these entities for the benefit of and at the direction of the owners.

7.    HSBC operated an affinity-marketing program referred to as the Global South Asian Diaspora ("GSAD") until 2012. From 1999 to 2012, the head of GSAD was an employee of HSBC's U.K. private bank and later detailed to HSBC Switzerland. Employees detailed to GSAD sought to recruit wealthy South Asian clients residing around the world to bank at HSBC or to expand their existing banking at HSBC-owned entities. Part of the GSAD program involved actively marketing onshore services in the United States. A few executives and employees assigned to GSAD encouraged U.S. persons to open and maintain bank accounts in Switzerland.

## II.    U.S. INCOME AND TAX REPORTING OBLIGATIONS

8.    U.S. citizens, resident aliens, and legal permanent residents ("U.S. persons") are obligated to report all income earned worldwide, including from foreign bank accounts, on their tax returns and to pay the taxes due on that income. Since 1976, U.S. persons have been obligated to report to the Internal Revenue Service ("IRS") on a Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

9.    Since 1970, U.S. persons who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year, have been required to file a Report of Foreign Bank and Financial Accounts, FinCEN Form 114, formerly known as Form TD F 90-22.1, (the "FBAR") with the Department of the Treasury. The FBAR for the applicable year during the relevant period here was due on June 30 of the following year.

10.    An "undeclared account" is a financial account beneficially owned by an individual subject to U.S. tax obligations and maintained in a foreign country, which the individual did not report to the U.S. government on an income tax return and an FBAR.

11.    Since 1935, Switzerland has maintained criminal laws that ensure the secrecy of client relationships at Swiss banks. Swiss law prohibits the disclosure of identifying information without client authorization, except in certain limited circumstances. Because of the secrecy

---

[2]    HSBC Switzerland is now in the process of closing its trust company, which has been wholly owned by HSBC Switzerland since the merger of HSBC Switzerland and HSBC Guyerzeller. At this time, the trust company is called HSBC Trust Company AG.

guarantee that Swiss bank secrecy laws created, these Swiss criminal provisions have historically enabled U.S. clients to conceal their Swiss bank accounts from U.S. authorities.

## III.    OVERVIEW

12.     From at least 2000 to 2010, HSBC Switzerland aided and assisted U.S. persons in evading their U.S. tax obligations, filing false tax returns with the IRS, and concealing their offshore assets and income from U.S. authorities.  HSBC Switzerland did so by opening and maintaining undeclared accounts for U.S. persons, by allowing third-party asset managers to manage undeclared accounts for U.S. persons, and by taking other actions to facilitate U.S. persons in concealing their assets and income and evading taxes.  HSBC Switzerland knew that U.S. persons were maintaining undeclared accounts in violation of U.S. law.  Many of these clients resided in the United States, including in the Southern District of Florida.

13.     In 2002, HSBC Switzerland maintained approximately 720 U.S.-person relationships with approximately $825 million in Assets Under Management ("AUM") for clients that were not declared (hereinafter "undeclared U.S.-person relationships").[3]  Although the number of undeclared U.S.-person relationships declined in the following years, the AUM increased, reaching a peak of $1.26 billion in 2007, as described below.

| Year | Number of Undeclared U.S.-Person Relationships at Year-End | Year-end AUM (in USD $ Millions) |
|------|------------------------------------------------------------|----------------------------------|
| 2002 | 720 | 825 |
| 2003 | 700 | 985 |
| 2004 | 660 | 980 |
| 2005 | 600 | 930 |
| 2006 | 560 | 1035 |
| 2007 | 550 | 1260 |
| 2008 | 540 | 910 |
| 2009 | 375 | 745 |
| 2010 | 265 | 615 |

---

[3]     Undeclared U.S.-person relationships, which are relationships in which the Bank did not have evidence of declared status, comprised less than 2.0% of the HSBC Switzerland's total AUM during the 2002-to-2010 period.  Many of the U.S.-person client relationships open in 2002 were inherited through the acquisitions. Other clients became U.S. persons after they opened their relationship by, for example, moving to the United States.  If a relationship was open during the relevant period and became U.S. related after it was opened, it is included as a U.S.-person relationship and reflected in the chart for any year that it was open. HSBC Switzerland also banked declared U.S.-person relationships.  Relationships with an account associated with an IRS Form 1099 or an identified, and timely-filed, FBAR are treated as declared U.S.-person relationships.

14.    U.S.-person accounts included individual accounts that were held in the names of the U.S. persons, sometimes with numerical or coded names.  In code-name or numbered accounts, the bank used a code name or number on the customer's account and on any documentation that the customer received from the bank in lieu of referring to the U.S. client by name.  These accounts also included accounts where U.S. persons controlled or owned the account through a nominee, including as settlors of trusts or foundations, beneficiaries of those trusts, or the beneficial owner of accounts held in the names of corporations, which were often established in offshore tax-haven jurisdictions with strict secrecy laws.

15.    HSBC Switzerland conducted business with U.S. persons through Bankers and client advisors.  At least twenty Bankers traveled to the United States during the 2000s and met with undeclared and declared clients, including meeting clients in the Southern District of Florida.  Other times, clients traveled to Switzerland and met with Bankers and client advisors about their accounts.

## IV.    OFFENSE CONDUCT

### A.    HSBC Switzerland Aided and Assisted U.S. Persons in Concealing Assets and Income

16.    HSBC Switzerland provided a variety of traditional Swiss banking services that aided its U.S. clients to help conceal their assets and income from U.S. authorities.  HSBC Switzerland Bankers advised clients that they could use HSBC Switzerland's services to conceal income and assets from the U.S. government.  The most significant services are set forth below, and some are described in more detail in the sections that follow.

  a. HSBC Switzerland Bankers on occasion advised clients not to return to the United States carrying more than $10,000 in currency or other monetary instruments to avoid filing Reports of International Transportation of Currency or Monetary Instruments, which might lead U.S. authorities to investigate the source of the funds being transported.

  b. HSBC Switzerland Bankers assisted U.S. clients in structuring withdrawals from their undeclared accounts via wire transfers in amounts less than $10,000 in an attempt to conceal the transactions, and their undeclared Swiss accounts, from U.S. authorities.

  c. HSBC Switzerland Bankers assisted U.S. clients to access funds held in their undeclared accounts by providing clients with credit, debit, or travel cards linked to their undeclared accounts.  Clients instructed the bank by telephone, mail, or email to load Swiss francs, U.S. dollars, or Euros onto these cards from the client's account at the bank.  The clients used the cards for purchases and remitted the unused balances back to their accounts.  Bankers cautioned at least a few clients not to use the cards in the United States.  Some types of cards did not have the bank or the U.S. client's name on them, and allowed U.S. clients to withdraw funds remotely or pay for goods and services without a clear paper trail back to their undeclared accounts in Switzerland.

    d.  HSBC Switzerland Bankers issued checks drawn on HSBC Switzerland's correspondent accounts, including at HSBC Bank USA, in the United States for U.S. clients. These checks, which were essentially cashier checks, included the name of HSBC Switzerland, but not the client's name or the name of the client's bank account, and were routinely provided to clients. U.S. clients used these checks to obscure the money's origin because such checks could be deposited without disclosing the name or ownership of the Swiss bank account.

    e.  HSBC Switzerland Bankers discouraged U.S. clients from receiving mail, including bank statements, at their homes in the United States. Instead, the bank held all mail correspondence for those U.S. clients, making their undeclared accounts less likely to come to the attention of the IRS. Multiple reports made by HSBC Switzerland Bankers following trips to the United States to meet with existing or prospective clients revealed that HSBC Switzerland Bankers frequently advised clients to sign "hold-mail" agreements with the bank in order to avoid detection of their accounts.

    f.  HSBC Switzerland Bankers advised U.S. clients not to transport account documentation from Switzerland back to the United States. Further, HSBC Switzerland Bankers told their U.S. clients to refrain from phoning the bank from the United States and to place phone calls to their Bankers from locations outside the United States.

**B.    HSBC Switzerland Created and Managed Nominee Entities for U.S. Persons to Help Them Hide Assets and Income**

17.    HSBC Switzerland Bankers advised U.S. persons to open and maintain bank accounts in the names of nominee companies and trusts. These nominee trusts and companies did not serve any business purpose, but were instead used to conceal the U.S. person's beneficial ownership of the accounts. By using a trust or corporation, it would appear that those entities, and not the U.S. person, owned and controlled the assets and income of the account.

18.    HSBC Switzerland utilized in-house trust companies or functions—including HSBC Guyerzeller Trust and its predecessors—to create nominee trusts and corporate entities for clients. HSBC Guyerzeller Trust and other trust services affiliated with HSBC Switzerland created these nominee entities in offshore tax-haven jurisdictions, such as the British Virgin Islands, Liechtenstein, and Panama.

19.    HSBC Switzerland used wholly owned or affiliated companies, including Cordico Management AG, to provide individuals from those tax-haven countries to serve as trustees or directors of the nominee entities. These trustees and directors employed by HSBC Switzerland's wholly owned or affiliated companies exercised little to no independence. Rather, they managed the accounts at HSBC Switzerland at the direction of the U.S. persons who beneficially owned the assets in the accounts.

20.     Even in circumstances where HSBC Switzerland did not utilize an in-house company to either create or manage the nominee entities, HSBC Switzerland knew that U.S. persons were the true beneficial owners of the assets in the accounts held in the names of trusts and corporate entities.  HSBC Switzerland Bankers knowingly accepted IRS Forms W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individual)), or HSBC Switzerland's substitute forms, provided by the directors of nominee companies and trustees of the trusts who falsely represented under penalty of perjury that the companies and trusts, and not the U.S. persons, were the beneficial owners of the assets for tax reporting purposes.

## C.     The Qualified Intermediary Agreement

21.     In 2001, HSBC Switzerland entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS.  Agreements under the Qualified Intermediary regime provided a framework for U.S. information reporting and tax withholding by a non-U.S. financial institution with respect to U.S. securities.  The QI Agreements were intended to ensure that, with respect to U.S. securities held in an account at the bank, non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons holding U.S. securities were properly paying U.S. tax.  QI Agreements, however, were also limited in scope and did not address non-U.S. securities and did not replace or supplant U.S. tax, securities, and criminal laws that also applied to a bank's conduct.

22.     The QI Agreement took account of the fact that Swiss law prohibited HSBC Switzerland, like other Swiss banks, from disclosing the identity of an account holder.  In general, if an account holder wanted to trade in U.S. securities and avoid mandatory U.S. tax withholding, the agreement required HSBC Switzerland to obtain the consent of the account holder to disclose the client's identity to the IRS.  The QI Agreement required HSBC Switzerland to obtain IRS Forms W-9 and to undertake IRS Form 1099 reporting for new and existing U.S. clients engaged in U.S. securities transactions.

23.     In an effort to avoid the QI Agreement's reporting requirements, some HSBC Switzerland Bankers encouraged their U.S. clients to create and open accounts in the names of offshore entities.  Consistent with all other Swiss-located banks, HSBC Switzerland treated these foreign nominee entities as the owners of the assets, despite the beneficial owners being identified on Forms A and similar documents maintained by the bank.  HSBC Switzerland did not report the U.S. persons' ownership of these accounts to the IRS.  In some instances, Bankers knowingly accepted false information from account holders, settlors, and beneficial owners regarding their citizenship or residence.

24.     After acquiring Republic Bank in 1999, the predecessor of HSBC Switzerland—but not HSBC Guyerzeller—continued Republic Bank's policy requiring U.S. clients to sign a U.S. Bank Secrecy waiver.  Despite obtaining waivers from a number of U.S. clients, HSBC Switzerland did not use these waivers to report U.S.-person accounts or income earned on the accounts to the IRS.  HSBC Switzerland did not change its stance towards U.S. tax compliance or consistently reject clients who refused to sign a waiver.

25.     In 2004, HSBC Guyerzeller sought to reduce its exposure to the U.S. market.  It decided to stop opening new relationships for U.S.-resident clients, to close accounts with AUM less than $750,000, and to require new clients to sign a U.S. Bank Secrecy waiver, which HSBC Switzerland already required.  HSBC Guyerzeller did not, however, change its stance towards tax compliance.  In order to appear to distance itself from the tax evasion scheme, the bank adopted a new policy regarding the management of nominee trusts and other entities.  That policy required the bank to shift management of approximately 20 entities connected to a few relationships from its in-house service providers to outside providers.  As noted in the minutes of a managing committee meeting, the new policy required that third parties manage structures that were "not tax compliant (*i.e.*, the funds are not reported to the IRS)."  Even though the bank knew that those U.S. clients were evading their taxes, it did not close the accounts.

26.     The new policy required an outside provider to manage the entities and accounts used by U.S. persons to evade their taxes.  However, for a few relationships, HSBC Guyerzeller recommended an individual ("Fiduciary 1"), who had been an employee of HSBC Guyerzeller in the 1990s and owned and operated companies that provided fiduciary and asset management services, to manage the entities.

### D.     HSBC Switzerland Created a North American Desk to Service Accounts for U.S. Persons and Others

27.     Prior to 2004, more than 100 Bankers managed a mix of U.S.-person and non-U.S.-person clients.  In general, those Bankers managed only a small number of clients who were U.S. persons.  In 2004, HSBC Switzerland management created a North American desk, generally staffed by four or five Bankers to focus on pre-existing U.S. clients (and also the clients of another country) and to help implement and follow U.S. Qualified Intermediary documentation requirements and SEC securities rules and regulations.  Despite creating this new desk, HSBC Switzerland was slow to transfer all U.S.-person accounts to be handled by the desk.

28.     Between 2005 and 2007, at least four Bankers on the North American desk traveled to the United States to meet at least 25 different clients, and took at least eleven trips to the United States.  During these trips, HSBC Switzerland Bankers on the North American desk met with undeclared clients and prospective U.S. persons in an effort to obtain new clients.  The following are illustrative examples:

   a.  During a trip to the United States in 2006, Banker A discussed with a U.S. client the provision of a credit card linked to the client's account for an upcoming trip to Europe.  When the client asked if the card could be used to withdraw funds in the United States, Banker A counseled the client not to use the card in the United States "to avoid any risks."

   b.  In 2006, Banker B attended Design Miami in an effort to recruit prospective clients.

   c.  In 2007, Banker A and Banker C planned a trip to the United States wherein Banker C was to stay in the United States for a month.  Banker A wrote in an

email that Banker C's mission was "to contact a maximum of prospects and existing clients."

29.     Some Bankers not assigned to the North American desk who retained U.S. clients despite the efforts at consolidation also traveled to the United States to meet with their clients.

### E.     HSBC Switzerland Exits the U.S. Cross-Border Business

30.     In early 2008, it became public that the U.S. government had opened a criminal investigation of UBS AG, the largest bank in Switzerland, for tax and securities violations in connection with its maintaining undeclared accounts for U.S. clients. After learning this information, HSBC Switzerland did not immediately cease its own cross-border business with U.S. persons, but began a series of policy changes that ultimately culminated in HSBC Switzerland's exit from the business.

31.     At first, HSBC Switzerland's management-instructed Bankers not to accept clients who were fleeing UBS in the wake of the investigation. Despite this directive, some Bankers assisted a few UBS clients to transfer their undeclared funds to HSBC Switzerland.

32.     In June 2008, HSBC Switzerland made its policy towards U.S. persons more stringent, as later memorialized in an October 2008 document. The policy stated that U.S.-resident accounts could only be opened in "exceptional circumstances" and stated that entity accounts for non-residents must include evidence that the "account is not for tax avoidance." The document circulating the new policy stated that "US authorities" were taking "a tougher stance on tax avoidance and on breaches of investment regulations."

33.     In February 2009, HSBC Switzerland decided to close accounts for U.S. persons who had $1 million or less in AUM. HSBC Switzerland permitted those U.S. clients holding more that $1 million to keep their accounts only if they signed a Form W-9, a waiver of Swiss bank secrecy, and a declaration of tax compliance. The declaration of tax compliance required the client to identify how they were declaring their account and listed the various U.S. tax reporting obligations.

34.     Even after HSBC Switzerland had begun forcing its U.S. clients with undeclared accounts to exit the bank, HSBC Switzerland Bankers assisted clients in closing their accounts in a manner that continued to conceal their offshore assets. Some Bankers directed their clients to other Swiss banks that were continuing to accept undeclared accounts.

35.     In some other instances, HSBC Switzerland Bankers allowed clients to close their accounts and withdraw the contents in cash, although bank management asked Bankers to advise clients not to do so. Clients who withdrew cash at account closing often did so to limit the paper trail between them and their undeclared accounts. For example, according to U.S. court filings, Andrew Silva, a U.S. person who inherited a share of an undeclared account held in the name of a trust with two other persons, received $100,000 in cash from HSBC Switzerland's office in Zurich in 2009. He did so following a meeting with an external lawyer, who had served as his external advisor for a decade, and who told him to withdraw the money in cash and provided him with envelopes to mail it to the United States. According to Mr. Silva, when he collected the cash, the bank advised him that it would not wire money to the United States because that would

8

leave a record of the transfer. Silva then mailed the cash to himself in the United States in a series of packages, each containing less than $10,000, in an attempt to evade currency-reporting requirements. After Silva pleaded guilty in the United States, HSBC Switzerland implemented a March 2010 policy to limit the amount of cash that a client could withdraw.

36.     In December 2010, HSBC Switzerland management decided to renew its effort to close U.S.-person accounts, even those known to be declared, with limited exceptions for fully documented non-resident U.S. person accounts with AUM greater than $5 million. HSBC Switzerland set out a specific closing process prohibiting certain types of transactions that could be used by clients to conceal undeclared assets, and it retained an accounting firm to support the closing process.

### F.     Examples of Misconduct

37.     Examples of the misconduct described generally above include the following specific instances of misconduct involving various HSBC Switzerland Bankers and U.S. clients:

  a.  Client 1

    i.   In approximately 1996, Client 1 and her siblings inherited the funds in a HSBC Switzerland account. At that time, Banker D and Banker E assisted Client 1 in opening an account at HSBC Switzerland in order to hold her share of the inherited funds. Banker E advised Client 1 to open the account in the name of a corporation in a tax-haven country, which in turn would be owned by a trust in a different tax-haven country. Banker E used HSBC Guyerzeller Trust to form the trust and provide trustees to manage the trust. Cordico Management AG provided nominee directors to manage the corporation and the account. Banker E advised Client 1 that this structure would make it less likely that the IRS would detect her ownership of the account.

    ii.  Although the Cordico directors nominally managed the corporation, Client 1 and her spouse freely accessed the funds in the account through direct communication with the Banker.

    iii. Bankers gave Client 1, her spouse, and their children immediate access to the funds in the offshore account by providing them with credit cards linked to the account.

    iv.  On numerous occasions in 2002 through 2006, at the command of Client 1, Bankers bid on and purchased works of art for sale at auction houses and galleries outside of the United States, and made a payment to a luxury vacation package provider, directly from Client 1's HSBC Switzerland account.

    v.   In 2007, after HSBC Switzerland ceased using its wholly owned subsidiaries to manage trusts and entities for U.S. persons, the bank

9

transferred management of the corporation to Fiduciary 1, who was a former employee of HSBC Guyerzeller.

b.  Client 2

   i.  In 2003, Banker F solicited the business of Client 2 and convinced him to transfer some of his assets to HSBC Switzerland. Client 2 and his spouse had accounts with at least three other Swiss banks.

   ii.  Banker F advised Client 2 to set up his account in the name of a personal investment company established in Panama. Banker F and his successor, Banker G, both advised Client 2 not to call them from a line in the United States and not to take account statements he obtained in Switzerland back to the United States.

   iii.  Client 2 closed his account in 2009, around the time that HSBC Switzerland began closing U.S. accounts.

c.  Client 3

   i.  Client 3 had an account at HSBC Switzerland from 1990 until 2009, which was funded by money received from his non-U.S. person family. In 2000, Client 3's Banker, Banker H advised him that if he wished to continue to invest in U.S. securities, Client 3 needed to transfer his assets to an account held in the name of a company not associated with Client 3. Banker H suggested using a British Virgin Islands corporation; however, no corporation was formed.

   ii.  Banker H instructed Client 3 not to call Banker H from inside the United States.

   iii.  Banker H provided Client 3 with a travel cash card that was periodically replenished with funds from Client 3's undeclared account. Client 3 used the card to withdraw cash from ATM machines in the United States and Europe.

   iv.  Client 3 closed his account in 2009, around the time that HSBC Switzerland began closing U.S. accounts.

d.  Client 4

   i.  A Banker spoke with Client 4 by phone and advised her to use "hold-mail" services. The Bank received Client 4's permission to not send mail to the client's U.S. address. The Banker noted that Client 4 had not declared her account to the IRS.

   ii.  HSBC Switzerland identified the account for closure in 2009.

e. Client 5

   i. In 2008, during the time that UBS was actively exiting U.S. account holders, Client 5, who had an account at UBS, contacted Banker I and explained that he needed to leave UBS.

   ii. Banker I opened an account for Client 5 in the name of a Panamanian corporation. Neither Client 5 nor Banker I disclosed Client 5 as a U.S. person when opening the relationship. In 2009, when bank management determined that Client 5 was a U.S. person, it directed that the client close his relationship.

   iii. In September 2009, Banker I assisted Client 5 in transferring the assets from his HSBC Switzerland account to an account at a bank in Israel.

f. Client 6

   i. In approximately 2006, Client 6 opened an account at HSBC Switzerland in the name of a foundation with a non-U.S. person listed as beneficial owner. He funded this account with an approximately $20 million transfer from a different Swiss bank. Client 6 met with Banker J in Zurich to open the account. Client 6 usually visited Zurich annually to meet with his Bankers about the account.

   ii. In 2009, in order to keep his account at HSBC Switzerland, Client 6 transferred his funds to an account in the name of his girlfriend, who was a citizen of Hong Kong. Bankers assured Client 6 that the account would not be disclosed to U.S. authorities and that, despite HSBC Switzerland's stated policy, they were willing to do business with Client 6 as long as the account was held in his girlfriend's name.

g. Sanjay Sethi

   i. In 2001, a GSAD Banker in New York City assisted Sanjay Sethi in opening an undeclared account in India, using Sethi's Indian passport as identification.

   ii. In 2002, Executive A, who led the GSAD program, met with Sethi at HSBC's offices in New York City. Executive A convinced Sethi to open an account at HSBC Switzerland, explaining that Swiss bank secrecy would protect the account from disclosure. Executive A explained that the secrecy laws would not apply for terrorist financing or "dirty money," but that Swiss judges would reject a request from the IRS that was based on tax evasion.

iii. Executive A assisted Sethi in opening his undeclared account in the name of a sham trust that was, in turn, owned by a sham company in the British Virgin Islands. Executive A assured Sethi that the structure would allow his money to grow, tax-free, in a manner that would not be known to the IRS. In 2003, Executive A assisted Sethi in opening an account at HSBC in the United States in the name of a sham Cayman Islands corporation, with a foreign person's name listed as the beneficial owner of the account, even though both knew that Sethi was the true owner of the account.

iv. In approximately 2007, Sethi met with Banker K at a hotel in New York City to discuss his account. Banker K told Sethi they could not meet in an HSBC office because "this business is quiet."

## G.   Voluntary Remedial Measures and Cooperation

38.    HSBC Switzerland, with the support of other HSBC-owned or controlled entities, has undertaken substantial remedial measures and extensively cooperated with the Department of Justice and IRS's investigation of the offenses detailed above. These measures include the following:

39.    HSBC contacted the Department of Justice in December 2008, prior to the resolution of the UBS investigation and years before the U.S. Swiss Bank Program.

40.    HSBC Switzerland conducted a thorough and full internal investigation and self-reported its misconduct.

41.    HSBC has facilitated the disclosure of client information and has cooperated in the prosecution of several former clients in the United States.

42.    HSBC Switzerland also recommended participation in the IRS Offshore Voluntary Disclosure Program ("OVDP") in writing in 2011 and retained a Swiss law firm and a Swiss accounting firm to conduct an extensive outreach program to contact clients and encourage OVDP participation.

43.    HSBC Switzerland advocated in favor of a decision made by the Swiss Federal Council in April 2012 to allow it and other banks to produce certain information to the Department of Justice and subsequently produced that information to the Department almost immediately in May 2012.

44.    HSBC Switzerland implemented new policies and procedures intended to protect against the use of its services for tax evasion. These initiatives included policies limiting cash withdrawals and discontinuing the use of holdmail, as well as a tax transparency policy that required a review of accounts against possible indicia of tax evasion and the closure of any account with unresolved issues. HSBC Switzerland has also implemented FATCA and the Common Reporting Standard.

45.     HSBC substantially restructured HSBC Switzerland.  Since 2009, the senior management of HSBC Switzerland has changed substantially, with a complete overhaul of its management team.  In addition to effectively exiting the U.S. market, HSBC Switzerland has also substantially reduced the total number of markets and clients it serves.  HSBC Switzerland now has fewer than 5,000 accounts in total.  This is a decrease of more than 85 percent since the late 2000s.

FILED by ___**DD**___ D.C.

**Dec 2, 2019**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

# 19-60359-CR-ALTMAN/HUNT

CASE NO._____

**18 U.S.C. § 371**

### UNITED STATES OF AMERICA

v.

### HSBC PRIVATE BANK (SUISSE) SA,

**Defendant.**

_____/

## INFORMATION

The United States Attorney charges that:

### Introduction

At times relevant to this Information:

1.    Defendant **HSBC PRIVATE BANK (SUISSE) SA ("HSBC Switzerland" or
the "Bank")** was a private bank incorporated in Switzerland. HSBC Switzerland was the
product of a series of mergers and acquisitions, including HSBC Guyerzeller Bank Ltd., which
merged with the Bank in 2009. HSBC Switzerland had its headquarters in Geneva, Switzerland,
and maintained offices in Lugano and Zurich.

2.    HSBC Switzerland provided a variety of banking and other financial services to
customers both resident inside and outside of Switzerland, including providing private-banking
and asset-management services to United States citizens, resident aliens, and legal permanent
residents ("U.S. persons"), some of whom lived in the Southern District of Florida. HSBC
Switzerland provided these services through relationship managers and other client advisors
("Bankers"), and also acted as a custodian of assets that were managed by both wholly owned
and third-party fiduciary service providers.

3.     HSBC Switzerland maintained some bank accounts on behalf of U.S. persons in the names of nominee entities and trusts. HSBC Guyerzeller Trust Company AG and HSBC Trust Company AG were wholly owned subsidiaries of HSBC Switzerland and were fiduciary-service providers that created and managed some of the nominee entities and trusts on behalf of HSBC clients.

4.     U.S. persons were obligated to report all income earned worldwide, including from foreign bank accounts, on their tax returns and to pay the taxes due on that income. U.S. persons were also obligated to report to the Internal Revenue Service ("IRS"), on Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year and to identify the country where the account was maintained.

5.     In addition, U.S. persons who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file a Report of Foreign Bank and Financial Accounts, Form TD 90-22.1 (since changed to FinCEN Form 114), ("FBAR"), with the Department of the Treasury.

6.     An "undeclared account" was a financial account beneficially owned by a U.S. person and maintained in a foreign country that the U.S. person had not timely reported to the United States on a tax return and FBAR.

## COUNT 1
## CONSPIRACY
## 18 U.S.C. § 371

7.     The factual allegations contained in Paragraphs 1 through 6 of this Information are realleged and incorporated by reference as if copied verbatim.

2

8.      From at least 2000 through 2010, in the Southern District of Florida and elsewhere, the defendant,

## HSBC PRIVATE BANK (SUISSE) SA,

unlawfully, voluntarily, intentionally, and knowingly conspired and agreed with U.S. persons, HSBC Switzerland Bankers and employees, and wholly owned and third-party fiduciaries and fiduciary service providers, (1) to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, namely, federal income taxes and (2) to commit offenses against the United States, namely, violations of Title 26, United States Code, Sections 7201 and 7206(1).

9.      It was an object of the conspiracy that HSBC Switzerland and its co-conspirators would conceal the offshore assets and income of U.S. persons who maintained financial accounts at HSBC Switzerland from the IRS, evade those U.S. persons' U.S. tax obligations, and file false federal tax returns with the IRS.

### Overview of the Conspiracy

10.     From at least 2000 through 2010, HSBC Switzerland assisted U.S. persons in concealing their offshore assets and income from U.S. tax authorities, evading their U.S. tax obligations, and filing false federal tax returns with the IRS. By 2002, the Bank held a total of approximately 720 undeclared relationships on behalf of U.S. persons with an aggregate value of approximately $825 million. The Bank's undeclared assets under management peaked in 2007, at approximately $1.26 billion. HSBC Switzerland and its co-conspirators used Swiss bank secrecy to conceal the accounts of U.S. clients from the U.S. tax authorities, and HSBC

3

Switzerland Bankers would emphasize this to clients and prospective clients. HSBC Switzerland also provided a number of traditional Swiss banking services that further assisted its U.S. clients in concealing their accounts from the U.S. government, including the use of numerical and coded names for accounts, prepaid debit, credit, and travel cards, and hold-mail services in which the Bank would not send any account documents to the account holders.

11.    HSBC Switzerland Bankers advised and assisted U.S. persons to open and maintain bank accounts in the names of nominee entities and trusts that did not serve any business purpose, in order to conceal the U.S. person's beneficial ownership of the accounts.

## Manner and Means of the Conspiracy

12.    Among the manner and means by which HSBC Switzerland and its co-conspirators carried out the conspiracy were the following:

> a. HSBC Switzerland opened accounts in Switzerland for U.S. persons that the clients did not report to the United States on either Forms 1040, Schedule B, or on FBARs, and for which the U.S. persons did not report or pay taxes on account earnings to the United States. The materially false Forms 1040 that clients filed were often electronically transmitted to the IRS through the use of interstate wire communications. Funds were often transferred to or from these accounts by means of wire transfers in foreign commerce.
>
> b. HSBC Switzerland managed undeclared accounts for U.S. persons at the Bank.
>
> c. HSBC Switzerland assured U.S. clients that Swiss bank secrecy would conceal their assets and income from being disclosed to U.S. tax authorities.
>
> d. HSBC Switzerland provided U.S. clients with code-name or numbered accounts that provided an extra level of concealment.

4

e.  HSBC Switzerland provided U.S. clients with prepaid debit, credit, and travel cards linked to their undeclared accounts, which allowed U.S. clients to withdraw funds remotely or pay for goods and services without a clear paper trail back to their undeclared accounts in Switzerland.

f.  HSBC Switzerland provided hold-mail services, under which account statements and other documents associated with the client's account would not be sent to the client's address in the United States.

g.  HSBC Switzerland created and managed nominee trusts and entities for clients via wholly owned fiduciary-service-provider companies such as HSBC Guyerzeller Trust Company AG and HSBC Trust Company AG and Cordico Management AG.  HSBC Switzerland used these wholly owned fiduciary-service-provider companies to provide individuals from tax-haven countries to serve as trustees or directors of the nominee entities

h.  HSBC Switzerland assisted clients in creating entities that were incorporated in offshore tax-haven jurisdictions, such as the British Virgin Islands, Liechtenstein, and Panama, for further concealment and to circumvent an agreement the Bank had with the IRS that required the Bank to report U.S. persons' ownership of accounts holding U.S. securities.

i.  Beginning in 2007, in order to appear to distance itself from the tax evasion scheme, HSBC Switzerland ceased using its wholly owned subsidiaries to create and manage nominee trusts, and transferred management of these trusts to an individual fiduciary who was a former employee of the Bank.

j.  Beginning in 2009, HSBC Switzerland closed accounts for U.S. persons who had $1 million or less in assets under management, or did not sign an IRS Form W-9

5

and other documents required by the policy. However, some Bankers assisted some clients in closing their accounts in a manner that continued to conceal their offshore assets, including directing their clients to other Swiss banks that were continuing to accept undeclared accounts and allowing clients to withdraw the contents of their accounts in cash.

## Overt Acts

13.     In furtherance of the conspiracy and to effect the illegal objects thereof, HSBC Switzerland and other co-conspirators committed the following overt acts, among others, in the Southern District of Florida and elsewhere:

a.  On various dates between 2000 and 2010, HSBC Switzerland Bankers opened new undeclared accounts for U.S. persons in the names of nominee entities and trusts, including, for example, an HSBC Banker who convinced a client who had accounts with at least three other Swiss banks to transfer some of his assets to HSBC Switzerland and to set up his account in the name of a company established in Panama.

b.  On various dates between in or about 2005 and in or about 2007, at least four HSBC Switzerland Bankers traveled to the United States in order to meet with at least 25 different undeclared U.S. clients, and made efforts to obtain new U.S. clients.

c.  In or around 2006, an HSBC Switzerland Banker travelled to the United States and attended Design Miami, a major annual arts and design event in the Southern District of Florida, in an effort to recruit prospective U.S. clients to open undeclared accounts at HSBC Switzerland.

6

d. In or around 2009, an HSBC Switzerland Banker allowed a U.S. client with an undeclared account holding approximately $20 million in assets under management to transfer his funds to an account in the name of his girlfriend, who was a citizen of Hong Kong. However, the U.S. client maintained control over the account, and the HSBC Switzerland Banker assured the U.S. client that the account would not be disclosed to U.S. authorities.

All in violation of Title 18, United States Code, Section 371.


ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY


STUART M. GOLDBERG
ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL
TAX DIVISION


MARK F. DALY
SENIOR LITIGATION COUNSEL
JASON H. POOLE
ASSISTANT CHIEF
GRACE E. ALBINSON
TRIAL ATTORNEY

7